THE PEOPLE OF THE STATE OF NEW YORK ex rel. BELLE GRAMENT, Relator, against FREE SYNAGOGUE CHILD ADOPTION COMMITTEE et al., Defendants.

Supreme Court, Special Term, New York County, January 14, 1949.

*Selig Kaplan* for relator.

*Shad Polier* for defendant.

BOTEIN, J.  On March 9, 1948, the relator and her since-divorced husband turned over their infant son of nine months to the defendant, an authorized child adoption agency as defined by subdivision 10 of section 371 of the Social Welfare Law.  At that time, each parent signed an " unconditional " surrender agreement.  There was also available, for irresolute parents, an agency procedure whereunder the child could have been surrendered conditionally — so that at any time during a specified period of

either thirty or sixty days the child would have been returned to its parents upon the mere request.

On March 22, 1948, or about two weeks later, the child was placed with the prospective adoptive parents, with whom he has since continued to live. On April 5, 1948, the relator telephoned the offices of the defendant and demanded that the child be returned to her. A conference was arranged, and the relator wavered in her resolution to secure the return of the child. There followed a four- or five-month period of indecision on the part of the relator. Then, when her eventual firm demands met with refusal by the defendant to return the child, she instituted this habeas corpus proceeding to obtain custody of her child.

The relator does not recall that at the time she relinquished custody she was advised of the alternative of a conditional surrender. She would have the court infer either that she was not so informed, or if so, that she was in such a state of emotional turmoil that she failed to grasp its significance.

I find, as asserted by the defendant, that both relator and her husband were advised in painstaking fashion of all their rights and of all available procedures; also, that from the time she first broached the subject of adoption to her husband, as correlative to her insistence upon divorce, to the time they turned over the child, the relator was clear in mind and sure of purpose.

I make this finding at the outset because much emphasis has been placed by both parties upon the circumstances surrounding the signing of the surrender instrument. Any consideration of the law of this case must necessarily commence with a determination of the legal import of that instrument. The relator regards it in the nature of a material and relevant evidentiary act reduced to writing, to be viewed in that light and not as a contract with any binding force. The defendant, on the other hand, asserts that an unconditional surrender to an authorized agency, while not irrevocable, is at least much more conclusive, much more impregnable to attack, than a surrender of custody to an individual for adoptive purposes.

The contract of surrender may not be shaken off as lightly as urged by the relator. " Surrender of custody of a child by a parent to an individual as an incident of adoption by the latter, whether or not by written instrument, is without statutory cognizance " (*People ex rel. Anonymous* v. *Perkins Adoption Soc.*, 271 App. Div. 672, 673, affd. 297 N. Y. 559). But the Social Welfare Law, taking cognizance of the surrender of a child to an authorized agency, states that the instrument relinquishing guardianship and custody to an authorized agency " may also

provide for the absolute surrender of such child to such author-ized agency. * * * " (§ 384, subd. 2.)

Any argument that a contract bearing statutory sanction and approval is without binding force is simply untenable. Such a contract derives dignity and strength from its very inclusion in the legislative pattern for the adoption of children. True, it may not accomplish an irrevocable commitment of custody and guard-ianship. But, as shall be developed, it materially alters and diminishes the rights of a mother seeking to regain custody after such a surrender.

In its endeavor to distinguish between the strength of a sur-render to an authorized agency and one to an individual, the defendant places great reliance upon *People ex rel. Anonymous* v. *Perkins Adoption Soc. (supra)*. It seems to me that the only distinctions drawn in that case between the rights of an agency and those of an individual receiving custody of a child pursuant to surrender relate to requirements of consent for actual adop-tion and the power to return the child to its natural parent. We are concerned with neither of these aspects in this proceeding. Furthermore, the prevailing opinion upon which defendant relies states: " The only issue here is whether the best interests of the child would be promoted, in accordance with the statutory language, or even under the *parens patriæ* doctrine, by return-ing the child to respondent " (p. 674).

Neither does *People ex rel. Harris* v. *Commissioner of Wel-fare, New York City* (188 Misc. 919) support the defendant's contention. The position taken by the court therein is qualified by its recognition that " the fact that the surrender was made and the fact that the agency obtained possession of the child and placed it with a family with a view to adoption, do not pre-vent the court from giving the child back to the mother if con-vinced that under all the circumstances that course is proper " (p. 923).

If any distinction exists between the rights of an individual and an authorized agency upon a custody proceeding of this nature, it must find its justification and its origin in the laws under which the agency operates. The relevant statutes will be searched in vain for any such difference in legislative treat-ment or for any expression of policy arguing such a difference in treatment.

The statutes do establish a procedure for the *adoption* of a child surrendered to an authorized agency different from that prescribed for a child surrendered to an individual. Subject to

certain limitations, the consent to adoption of the parents of a child born in wedlock is required (Domestic Relations Law, § 111, subd. 2); but such consent is not required of parents who have surrendered their child to an authorized agency for adoption (§ 111, subd. 4). The consent only of the agency is necessary. Great, usually decisive, consideration is given in adoption proceedings to the wishes of parents who have surrendered infants to individuals. Little, if any, weight is attached to the status of parenthood in adoption proceedings after surrender to an authorized agency.

The Social Welfare Law nowhere endows surrender to an agency, insofar as custody *prior to adoption* is concerned, with irrevocability or expressly with less limitations than surrender to an individual. In fact, subdivision 1, of section 383, provides that " the parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except * * * in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child. * * * ''

It is thus apparent that the Legislature has gone to great pains to circumscribe, in connection with adoption, the rights of parents who have surrendered their child to an authorized agency, and that it has gone to equal pains to define their rights to custody prior to adoption. The related statutes, which are at least presumptively an embodiment of the social judgment and conscience of the community, form a well-integrated, compact and uncomplicated procedure, which bears the impress of careful thought and intelligent planning. In short, it would appear that the Legislature has decided that every measure must be taken to render a consummated adoption unassailable; also, to protect at all times the repute of the adoptive agency and the evolving status of the prospective foster parents. In this latter regard, however, the Legislature did not shut the agency doors forever, prior to adoption, to a " fit, competent " parent, " able to duly maintain, support and educate " her child, who after the impact of physical separation suffered a change of heart and desired to recapture custody. This legislative concern accounts for the statutory provision that " the name of such child shall not be changed while in the custody of an authorized agency " (Social Welfare Law, § 383, subd. 1).

Our immediate inquiry, therefore, must be directed to a definition of the rights of a surrendering parent. The concern

of the Legislature for the child is identical with that of the court, acting through its equitable powers as *parens patriæ* of infants. '' He [the chancellor] acts as *parens patriæ* to do what is best for the interest of the child. He is to put himself in the position of a ' wise, affectionate and careful parent ' '' (*Finlay* v. *Finlay,* 240 N. Y. 429, 433). '' It is now too well settled to require fortification by extended citations from cases that, in determining to whom the custody of an infant of tender years shall be confided, the paramount and controlling consideration is the welfare of the infant '' (*Matter of Meyer,* 156 App. Div. 174, 176).

The legislative solicitude that '' the interest of such child will be promoted '', is statutory codification of the judicial norms governing the determination of common-law writs of habeas corpus relating to the custody of children. It has been stated that '' in the case of an infant of an age to be incapable of determining what was best for itself the court or officer made the determination for it, and, in so doing, the child's welfare was the chief end in view '' (*People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238, 241).

The problem of determining who shall have custody of a child may be presented to the courts in a variety of situations — as in connection with a judicial separation or divorce, or a disputed guardianship, a proceeding to deprive the natural parent of custody, or a proceeding, such as this, by the natural parent to regain a custody previously relinquished. The decisive consideration in each instance is the welfare of the child. But the factors to be weighed in each situation are not constant. Thus, where the custody in controversy resides in the natural parent, the mere fact of parentage carries a presumptive strength which can be overcome only by a powerful showing that the interests of the child require that custody be wrested away. Once the custody of the natural parent has been terminated, this presumptive significance loses a great deal of its vigor. '' The mother's predominant natural and legal right to the care and custody of her own child '' (*People ex rel. Hydock* v. *Greenberg,* 273 App. Div. 710, 713) remains, however, the most important single factor to be considered in resolving the question of custody presented in this proceeding.

So important is the status of a natural parent, that in determining the best interests of the child, it may counterbalance, even outweigh, superior material and cultural advantages which may be afforded by adoptive parents; provided, of course, that the

parent " is fit, competent and able to duly maintain, support and educate such child " (Social Welfare Law, § 383, subd. 1). For experience teaches that a mother's love is one factor which will endure, possibly endure after other claimed material advantages and emotional attachments may have proven transient.

Among other pertinent factors which must be considered are the age of the child; the periods of time the child has spent with his natural parents, at the institution and with his foster parents; the effects, if any, of removing the infant from the agency or his foster home; and the affection, economic and psychological well-being and the cultural advantages which the infant can reasonably anticipate from the foster parents.

An evaluation of only the above-mentioned factors in the proceeding tilts the scale heavily on the side of the prospective adoptive parents. On March 22, 1948, the child was turned over to the adoptive parents deemed most suitable for him. The defendant had a waiting list of ten times as many couples desiring to adopt as there were available children. It was, therefore, able to screen these couples and " match " the child to the adoptive parents in various respects, such as appearance, intelligence, etc.

Unquestionably, these adoptive parents are a stable, happily married and well-adjusted couple, providing a normal family circle and financial security. Strength is lent to the defendant's assertion that they give love, warmth and full acceptance to the child by the fact that when advised of the mother's demand in April, 1948, with a possibility of court action, they elected to take their chances on being permitted to retain him, fully appreciating the emotional strain to which they would be subjected should custody be restored to the mother.

Yet, although love, security, acceptance, are prime factors in the health and welfare of an infant, these very substantial advantages may be equated unless the relator, because of personal deficiencies, lacks the capacity adequately to discharge her parental responsibilities. This is the issue squarely raised by the defendant. It asserts that the relator has such personality and emotional defects as to preclude her from establishing and maintaining a sound and healthy parent-child relationship. If this contention is sustained by the evidence, I have no choice but to dismiss this writ.

Both parties to this proceeding are asserting their respective claims, sincerely, in complete good faith, and with commendable motives. There is no doubt that the relator, irrespective of the reasons ascribed by the defendant for her change of heart, for

the present at least sincerely and unreservedly desires to raise the child herself. And there is no doubt that the adoptive agency just as sincerely and unreservedly opposes her application from a conviction that she is not fit to assume that responsibility.

Furthermore, there is no question as to the high standards of both parties. There is not the slightest hint that the relator, who has supported herself since girlhood, has not always comported herself with the utmost propriety. Nor is there any doubt that throughout the thirty years of its existence the defendant has dedicated itself to rendering a great social service in exemplary and public-spirited fashion. For these reasons this is not the ordinary custody proceeding, in which once the main stream of deduction is uncovered, all tributary evidence is found to feed its flow.

A psychiatrist of the highest repute examined the relator several times on behalf of the defendant. The purpose of these examinations was to furnish expert guidance to the defendant in connection with the decision it was called upon to make relative to the relator's demand for the return of her child. He reported that the relator was a constitutional psychopath with abnormal emotionality — " the form of psychopathy * * * which is classed as immaturity * * *." He stated that she could not form meaningful relationships. She is wrapt in her fantasies * * * In her inner life there is no distortion of reality, nor artistic features, but rather an egocentric, childlike quality * * *."

The relator produced a psychiatrist who examined her for the purpose of testimony in this proceeding. He testified that the relator is mentally and morally qualified to take care of her child — that she is not only adequate but possesses the potentialities of being an excellent mother. The two experts are in irreconcilable conflict.

A psychiatrist, Dr. Marion E. Kenworthy, whom the relator's expert himself had previously characterized as unsurpassed in the field of social service, was called by the defendant. She had not examined the relator and endeavored not to be drawn directly into the dispute between her two professional colleagues. However, in answer to several hypothetical questions relating to factors which had been given great weight by both physchiatrists, she invariably was in accord with the opinion of the defendant's expert and in definite disagreement with the opinion of the relator's expert.

The determination of the relator's fitness to raise her child would appear in large measure to reside in a resolution of the soundness of the psychiatrists' viewpoints after testing them by the pertinent evidence in the case upon which, in large part, their opinions were based. A brief review is, therefore, indicated of such evidence as bears upon the petitioner's emotional stability.

The relator is a young woman of twenty-five, pleasant in appearance and reserved in manner. She has been employed since girlhood in good positions on the secretarial level. During the recent war she served in the Marine Corps, rose to the rank of sergeant and her service was characterized as excellent upon her discharge.

In August, 1946, she was married. Her husband is an intelligent and personable man, born in Spain, of better than high school education and resident in this country only a few years. The baby whose custody is sought was born June 12, 1947. It is the relator's contention that she underwent an emotional disturbance following her marriage, that she struggled to adjust herself and failing that, became fearful of a nervous breakdown. She pressed for a divorce, and claims that with her apprehension of a breakdown and her lack of confidence in her husband came a concern for the future of her child which led her to decide to give him out for adoption. Her sisters and her husband, the latter reluctantly, approved that plan.

At the time of the surrender of the child she possessed about $2,500 in Government bonds and cash. Her husband had a like amount. Some months before the birth of the baby, the relator and her husband had moved to Lancaster, Pennsylvania, where her married sister lived. He procured a position and earned enough to maintain a home on a modest basis. There were no insurmountable financial pressures which impelled the giving of the child for adoption.

On March 9, 1948, when the relator and her husband visited the offices of the defendant with their child, they were met there by her two sisters residing in New York. She consulted with them throughout the day. They advised the agency of their approval. The required interviews and formalities were concluded after several hours, the baby turned over to the defendant, and the relator, her husband and her sisters left.

The relator has testified that when she notified the defendant that she wanted her child back, she was told to consider the matter carefully, to try and find a place for the baby to live, preferably with relatives, and that then, the question of return

would be taken up. This was unquestionably good and accepted practice on the part of the defendant. The relator was unable to find such a place, none of her relatives could accept the baby, and there ensued an inconclusive series of talks between her and representatives of the defendant, in which she did not press very vigorously for the return of her child. The relator states that she was still very confused and attempting to do the right thing.

The defendant has submitted testimony, which is undisputed, that during these talks the relator decided she would place the child in an orphan asylum while she took a position. The defendant's representatives would not approve this course, either as a temporary expedient with an uncharted future, or as a permanent change of conditions. This position also was conclusively supported by evidence as to the best and the accepted practice in adoptive agencies.

With the matter in this indeterminate state, the relator took a position in New Hampshire as secretary to the manager of a summer hotel. By the end of August she evidently had resolved her doubts and steeled herself to a determination to recapture her child. She testified vaguely and rather incoherently that she had made arrangements with a widow who occupied a cheerful apartment in Bronx County providing for a room for herself and her child in return for housekeeping services and caring for the widow's child during the day. She testified that she proposed to continue on this basis until her savings of $2,500 were exhausted, by which time she estimated her child would be of nursery school age, so that she could secure a position, place her child in a nursery school all day, then bring him home at the close of the day.

The relator agreed to see the psychiatrist suggested by the defendant. Late in September he reported substantially as set forth above. Upon his report and its own history and findings, the defendant informed the relator that it would not give her custody unless directed to do so by court order. Thereupon the present proceedings were instituted.

The lay mind immediately juxtaposes the psychiatrists' opinions with the fact that there is no indication of immoral or antisocial conduct on the part of the relator at any time, nor of any emotional disturbance prior to her marriage. Emerging prominently from the relator's history and stressed by her psychiatrist is her unblemished record in the Marine Corps. Both the psychiatrist called by the defendant and Dr. Kenworthy

testified that the psychopathy attributed to the relator by the former had no morality or delinquency implications, that it denoted emotional instability only. Also, they stated it was not unusual in such cases to be confronted with a previous history devoid of incidents.

The next question which suggests itself is whether, as inferred by the relator, the defendant's psychiatrist did not interpret as a constitutional psycopathy a psychiatric involvement which followed a reactive depression brought on by the surrender of the child. To this suggestion the defendant's psychiatrist flatly stated that his diagnosis was not based upon any environmental charge, nor upon any circumstances occurring as late in the relator's life as the date of surrender of her child. He also testified he had no reason to believe that she had in fact suffered any reactive depression before or at the time of the surrrender, as diagnosed by her psychiatrist.

There are circumstances which would appear to support this latter conclusion. The relator was collected and practical enough on March 9th to insist that the adoptive agency reimburse her in the sum of $20 for the expenses which she and her husband had incurred on their round trip from Lancaster. Her husband testified she had at no time evidenced any emotional disturbance. Neither her sister, who resided in Lancaster and with whom she consulted constantly, nor the physician who allegedly treated her for her nervous ailment, was called to testify to any emotional disturbance. Nor did she produce her two sisters, resident in New York, who had counselled with her on the day of the surrender of the infant and knew her emotional state as of that time.

True, the testimony of the husband may be viewed in the light of his self-interest — as possibly motivated by a desire to avoid financial responsibility for the maintenance of his son. However, I may not overlook the fact that he originally opposed the divorce and finally agreed after the relator's intense insistence; and that it was she who first presented to him the idea of giving their child out for adoption. It is as a proximate result of the relator's instigation of the divorce that she can only extend to her child, for the present at least, a fatherless home; so that she can offer only one parent, as contrasted with the two he enjoys in his adoptive home. The contemplated divorce and the fact that later, when she was asking for the return of her child, she wished to place him in an orphan asylum, lend some validity to the defendant's contention that her prime

motive in turning over the infant was that she wanted to resume the status of a single woman, unencumbered by a child.

It is difficult to determine whether her subsequent waverings and vacillations stemmed from the tortured conscience of a distraught mother striving to reach the right decision for her child's welfare, or whether they were manifestations of the psychopathy diagnosed by the defendant's psychiatrist. The defendant ascribes her change of heart to '' an overweening concern for social disapproval ''.

Certain passages in the letters she wrote to her husband during the summer would appear to give substance to the last-mentioned charge of the defendant. On the other hand, they could also be attributed to a normal expression of feminine curiosity about a community's reaction to an unusual severance of domestic ties. Many, many other words and actions of the relator have been introduced or described during the hearings and characterized with equal plausibility by the contending parties as either part of the pattern of psychopathy or as normal actions or expressions under the circumstances.

There is also clear contrition and pleas for forgiveness for her conduct expressed in these letters. These too are susceptible of explanation. But there is one letter, that of July 14, 1948, which directly refutes her most significant testimony, and for which relator, upon my direct inquiry, could furnish no explanation. This letter reads in part:

'' Yes, we can reunite but without Mark [the child whose custody is in dispute].

'' Shall we darling, please.

'' This time I will be a true woman and accept life as it is and try to overcome those juvenile periods I sometimes get ''.

Finally, mention should be made of the testimony of the psychiatrists called by the defendant as to the permanent harmful effect upon the child were he to be now taken from his adoptive home. And of the horrifying consequences if the following excerpt from the defendant's psychiatrist's report should prove prophetic: '' Undoubtedly, some improvement in (relator's) disturbance could be achieved by proper treatment but this treatment would take a very long time. A decision to return the child to her, based on the assumption that she will probably improve through treatment, might conceivably lead to the situation that her improvement would include the insight that it would have been wise to leave the child with the adoptive parents.''

There is no point to further review of the evidence. Separately, these facts and most of the other evidence, can be reconciled with a normal personality. Collectively, however, they form impressive corroboration of the defendant's position.

But the hard core of this problem eludes an exclusively legal approach and determination. A sense of serenity with the solution is achieved only when it is realized that by giving her child over to an agency, on terms of presumptive finality, the relator clearly affected her moral claim to the child. And such is the public policy, as indicated above, that her moral claim is synonymous with her legal claim, and the moral values are one with the legal values involved.

For what is this moral claim of a mother to her child? On what does it rest? What is it which makes motherhood so precious a boon that society chooses to leave a child even with the most poverty-ridden and ignorant of mothers rather than give him over to even the wealthiest and most cultivated of foster parents? What is expected of a mother which is of such incalculable worth as to outweigh all else in the world?

What except a fullness of love for the child, a totality of dedication to it, of an all-embracing consecration that knows no wavering, no swerving. This is a mother's gift, for which, society holds, a child may well count all the world well lost.

And it is in just this that the relator is found wanting. She is a person of intelligence and socially acceptable character. She is in my opinion a person no more unstable than a multitude of other persons. But she gave up her child of her own free will, to implement a reconstruction of her personal life; not after her last dollar had been spent and her last resource drained, but with a sizeable sum at her disposal. Regretting her action thereafter, for five months she nevertheless time and again faltered in her resolution. Her letters reveal repeated periods in which she envisaged with equanimity a future without this child. Such conduct does not reflect the attributes required in law and in morals to regain custody of a child in a proceeding of this nature.

With the well-being of the infant paramount and uppermost in my mind, and despite my deep sympathy for the well-intentioned relator, I am constrained to direct that the child remain in his present custody. Writ dismissed.