In the Matter of MARY ROE*, Respondent, *v*. NEW YORK FOUNDLING HOSPITAL, Appellant.

First Department, February 25, 1971.

---

* Name used herein is fictitious for purposes of publication.

*William P. Ford* of counsel (*Thomas R. Esposito* with him on the brief; *Mudge Rose Guthrie & Alexander,* attorneys), for appellant.

*Philip F. Solomon* of counsel (*Solomon & Solomon,* attorneys), for respondent.

McNALLY, J. This custody proceeding was before us on petitioner's appeal from an order of March 19, 1969 denying her application for custody (33 A D 2d 83). The appeal therefrom to the Court of Appeals (27 N Y 2d 533) on a stipulation for judgment absolute was dismissed, the court holding that such a stipulation in custody matters was contrary to public policy. We held in 33 A D 2d 83 that petitioner had voluntarily surrendered her child and consented to his adoption. We found the boy, born on September 28, 1967, had been afforded a good family life with the adoptive parents. However, the matter was remanded for an expeditious new trial on whether the best interests of the child dictated his return to the petitioner as one fit, competent and able to support, educate and care for him. The new trial commenced September 29, 1970 and after five hearings, one out of court, concluded on November 10, 1970, on which date the court rendered its oral decision granting the petition, which is formalized by the order and judgment entered November 16, 1970. On this record we conclude the petition should be denied and custody of the child continued with the adoptive parents.

Petitioner, unmarried, on September 28, 1967, then 29, gave birth to the boy in San Jorge Hospital in Puerto Rico. She is and has been all her life a resident of New York. The father of the boy is a physician, married, residing with his wife and four children, the youngest three years of age. Petitioner and the father of the child met as employees in the office of a common employer. The father opened his office in October, 1963 and petitioner became his secretary. In or about 1965

they became intimate. Petitioner became pregnant during January, 1967. The father advised an abortion in Puerto Rico and made arrangements therefor. The petitioner did not submit to the abortion. Instead, she gave birth to the boy on September 28, 1967 in Puerto Rico.

Prior to the birth, in the latter part of August, 1967, petitioner sought and received advice concerning adoption from the respondent's supervisor of intake. On October 27, 1967, the petitioner brought the child from Puerto Rico and placed him with the respondent. The child was placed in a foster home and returned to the petitioner at her request the latter part of March, 1968. The petitioner then took the child and lived with him at her sister's home for about six weeks. The sister had three children of her own. The petitioner went to work. The sister found it too difficult to care for her own children, in addition to the petitioner's child. On May 16, 1968, the petitioner returned the child to the respondent. On May 17, 1968, petitioner executed a written surrender of the child.

An instrument relinquishing custody to an authorized agency may provide for the absolute surrender of a child to such authorized agency. Such a contract derives dignity and strength from its inclusion in the legislative pattern for the adoption of children. If it does nothing else, it materially alters and diminishes the right of a mother seeking to regain custody after such a surrender. (*People ex rel. Grament v. Free Synagogue Child Adoption Committee*, 194 Misc. 332.)

Petitioner was in constant communication with respondent from October 27, 1967 to March, 1968, when the child was returned to her, as well as during the period the child was with her prior to the surrender. On May 31, 1968, the child was placed with the adoptive parents with whom he has been continuously.

This proceeding was instituted by order to show cause dated November 12, 1968 on the petition of the mother verified November 11, 1968, alleging that the respondent had agreed to return the child within six months of the surrender. Petitioner also alleged that her parents are willing to receive her and the child at their one-family dwelling owned by them, and that the child's father was willing to provide adequate support. At the first trial, the petitioner testified that the child's father was prepared to establish a trust fund of $50,000 and to pay $100 weekly for the support of the child. The father did not testify at that time. The first trial court found the petitioner to be an intelligent and mature woman of good education and family background, employed as a secretary earning $160; that the

surrender of May 17, 1968 was voluntary and final, and not conditional, as alleged by the petitioner.

In addition, the court also found: "Petitioner is still single with no prospects of marriage. She has no plans for the raising of the infant other than the offer to help from her parents. Her mother and father, 56 and 72 years of age, respectively, are on pensions and petitioner presents no evidence with respect to how she will support herself except the vague, unsupported statement that the putative father has agreed to contribute to the child's care, which she will supplement by part-time employment." The court concluded the best interest of the child would not be promoted by his return to the petitioner.

On the prior appeal (33 A D 2d 83) we concluded, as did the trial court, that the surrender was voluntary and unconditional, and that the boy is presently afforded a good family life with his adoptive parents. We held, nevertheless, that the petitioner, as the mother, was entitled to establish that the best interests of the boy " compelled the Court to undo what she had done ", in which event " custody of the boy would again be entrusted to his mother ". We found the record lacking and directed a " new trial ". We adverted to certain deficiencies and requested that they be supplied at the new trial. Insofar as the issue whether the mother was " fit, competent and able to duly maintain, support and educate such a child " our direction for a new trial sought a full and unlimited scope of inquiry. We suggested by way of elaboration, and not by way of limitation, that the second trial include evidence on the financial condition of the petitioner's father and his willingness to receive the boy; petitioner's employment, including duration, hours and compensation; clarification on the suggested trust fund to be established by the child's father, or if the existence of the fund be not established, the financial capacity of the father to meet his support commitment.

At the conclusion of the second trial, the court rendered its oral decision, finding that the petitioner has been employed for two years as a medical secretary; that her gross weekly salary is $185; that her hours are 8:30 A.M. to 3:45 P.M., except Friday when they are 1:00 P.M. to 5:00 P.M.; that the petitioner's parents own their one-family dwelling unencumbered, and have modest investments, which with pensions together with petitioner's earnings, adequately secure the care, support and maintenance of the child. In addition, the court found the financial assistance of the child's father is unnecessary for the support and maintenance of his son, and that the petitioner does not expect or desire his financial support.

We are satisfied that with the aid and assistance of her parents, the petitioner can provide for the care, maintenance and financial needs of the child. Nevertheless, on this record, we are constrained to hold that the best interests of the child do not compel the undoing of what the petitioner has done, but that on the contrary his best interests would be jeopardized if the present custody is disturbed.

The order denying the petition was made March 19, 1969. The order for a new trial was made November 20, 1969. Since March 19, 1969 and through the summer of 1970, the intimate and illicit relationship between the petitioner and the child's father continued unabated. A second pregnancy ensued which terminated spontaneously. Thereafter during July, 1970, the father interrupted a vacation with his family in St. Croix, to live with the petitioner four or five days in Puerto Rico. On September 28, 1970, on the eve of the first day of the second trial, the petitioner met and had dinner with the child's father.

On the second trial, the petitioner unequivocally testified she loved the child's father and would marry him if she could, and, in addition, that the father had promised to marry her. The father of the child also testified on the second trial, and his voluntary testimony, on behalf of the respondent, is to the effect that he is the father of the child and that his relations with the petitioner have continued up to the time of his testimony at the second trial. He testified that he was assured by the petitioner "she was on birth control pills" and there would be "no problem concerning pregnancy"; he denied any promise to provide a trust fund for the child. The record does not demonstrate or suggest that the petitioner has any ulterior motive. Petitioner, albeit unwisely, was and is totally and unselfishly devoted to the father and, despite all her travail, and the extremely selfish and inconsiderate conduct of the father, shielded and protected him from exposure or repercussions in respect of his family and profession. There is no suggestion of any monetary motive on the part of the petitioner. Moreover, petitioner has affirmatively refused and disclaimed any desire for support on the part of the father.

The father, acknowledging paternity of the child, testified he was solely interested in the child's welfare. The record fails to establish any intimate relation between the father and the child. He has not contributed to the child's support. The testimony of the father, voluntarily given, strongly disapproves of petitioner's custody of the child. The father's testimony, given at the risk of jeopardizing his marriage, family and professional career, suggests a very binding attachment to the

petitioner which he believes, consciously or unconsciously, will be adversely affected if the petitioner resumes custody of the child. The petitioner's ill-advised but apparently irresistible love for the father is unfortunately reciprocated by irresponsibility, disloyalty and at least on one occasion by physical violence.

We do not believe that the father is concerned with the child's welfare and we do not share the opinion of the trial court that the petitioner will not continue her affair with the father. The petitioner has been unable or unwilling to adjust to the fact that the father does not intend to divorce his wife and that, to the contrary, he has enlarged his family during his affair with the petitioner. She has been unable or unwilling to terminate her intimacy with the father even during the pendency of this litigation and has allowed herself to become pregnant by him during that period. The father repeatedly advised and encouraged aborting the child, and both before and after his birth counseled his adoption. The record fails to sustain the conclusion of the trial court that the affair between the parties is at an end. In the circumstances, custody with the petitioner may expose the child to the antipathy of the father and the fruits of a frustrating, unsatisfactory and turbulent, illicit relation, giving rise to emotional symptoms and reactions which will be inevitably visited upon the child.

In *People ex rel. Anonymous* v. *New York Foundling Hosp.* (17 A D 2d 122, 125–126, affd. 12 N Y 2d 863) Mr. Justice, now Judge BREITEL expressed the opinion of this court in the following language: '' Perhaps the most significant factor to be considered in cases of this kind is the motivation of the mother in seeking return of a child. It is recognized that very often there is a substantial risk of improper motivation. In such case the authorized agency and the court must be especially alert not to permit the improper motivation to endanger the interests of the child or lead to any other noxious consequence.

\* \* \*

'' Considering the record in this case, there is enough to cast grave doubt on whether relator has so stabilized her own relations or become so stable in her own mind to suggest the return of the child to her. Since, especially with the passage of time, the interests of the child would be seriously and increasingly jeopardized by return, the petition was properly dismissed.''

The adoptive parents have demonstrated their attachment to the child and their fitness and competency. They are financially able to support, care and educate the child. We conclude that the record fails to establish that the best interests of the child

compel the undoing of her surrender of him or to disturb his present custody.

The judgment should be reversed on the law, the facts and in the exercise of discretion, and the petition dismissed, without costs.

STEVENS, P. J. (dissenting). I dissent and would affirm.

The facts have been fairly and adequately set forth in the majority opinion and need not be repeated here in this most difficult case. When the case was before us on a prior occasion we found the record lacking in evidence that petitioner is " fit, competent and able to duly maintain, support and educate " the child whose custody she now seeks (Social Services Law, § 383). We directed " an expeditious new trial on the issue whether the best interests of the child dictate his return to petitioner as one fit, competent and able to support, educate and care for him " (33 A D 2d 83, 85). Unfortunately, an additional year has passed before the case is up again for review.

Since November, 1968, petitioner has been involved in litigation seeking the return of her child. There is no doubt that she voluntarily consented to adoption in May, 1968. The record indicates nevertheless that prior to adoption and after the lapse of but a few months, she sought to have her child returned. Unsuccessful in her efforts, she resorted to litigation. Had it been possible to finally resolve the matter at that time much heartache might have been avoided. We are not blind to the fact that with the passage of time the child might have earned a secure place in the affections of the proposed adoptive parents. Nor is there any indication that his material needs are not adequately met. However, if it be concluded that the natural mother is fit, competent and able to support and educate the child, precedence should be given her.

The record indicates that the petitioner mother is well educated, a steady worker, with undoubted love for the child she bore. Her relationship with the putative father seems to be the single lapse in a life otherwise lived in accordance with the approved moral code of the society of which she is a part. That it has continued is doubly unfortunate because the putative father has shown no inclination to share even a portion of the financial burden necessarily incurred in the rearing of a child. Nor does it appear that such counsel as a father might afford a son will be forthcoming from him.

Incompetency or fitness of the petitioner must revolve around a determination of whether the moral lapse, or deviation from

the accepted norm, is in and of itself a disqualification, financial ability to maintain and support having been demonstrated. Moreover, the fact that the parents of petitioner who, through petitioner's mother, have expressed a willingness to aid should that become necessary, operates as additional insurance for material needs. I would hold that the continuing relationship between the petitioner and the putative father, though neither approved nor sanctioned, should not automatically disqualify the petitioner, nor lead, irresistibly, to the conclusion that she is not a fit and competent person to maintain, educate and support the infant. As the natural mother, all things being equal, she should have a superior right to the infant.

While we speak always of the welfare of the child as of paramount concern, a decision that a mother should be permanently separated from her child is also a matter of grave concern for the court as a part of a total picture. The rearing of a child, whether it be by natural or adoptive parents, is not a venture the successful outcome of which is guaranteed. Nor can the outcome be predicted with certainty.

The happiness and well-being of a child can rarely be assured beyond the informed judgment of the moment. The status of illegitimacy in the past posed problems of considerable consequence, and were this case being decided 20 years ago, the conclusion I now propose might well have been different. Tolerance, a sympathetic understanding, though not universally achieved, a more rational acceptance of a person as an individual for what he is, rather than the circumstance of his birth, persuade me that this infant would not face an insuperable handicap in that respect if returned to petitioner. The risk of long-term psychological injury, while it exists, is minimal from the circumstances here evident. A similar risk exists in adoptions as well, though somewhat different in nature. Without in anywise detracting from the relationship of adoptive parent and child, the bond between natural mother and child is generally the strongest of all bonds. To a mother who wants to remain a parent, and has so demonstrated, and who by the evidence is fit, competent and able, I would return this child. I therefore dissent and vote to affirm.

CAPOZZOLI and KUPFERMAN, JJ., concur with McNALLY, J., STEVENS, P. J., dissents in an opinion, in which NUNEZ, J., concurs.

Judgment, Supreme Court, New York County, entered on November 16, 1970, reversed, on the law, the facts and in the exercise of discretion, without costs and without disbursements, and the petition dismissed.