Jasen, J.
This appeal involves the return of an out-of-wedlock infant to its natural mother after she had executed a purported surrender of the child to an authorized adoption agency. The case does not involve the undoing of an adoption or the return of an adopted child to its natural parent. Nor does the case involve the undoing of a surrender by the natural mother on her mere say-so, but rather the undoing is based on a finding of fact that for various reasons, some obvious, the surrender was not made by her with such stability of mind and emotion that the surrender should not be undone for improvidence. On the other hand, there is not the slightest suggestion that the adoption agency was unfair or guilty of any overreaching in obtaining the surrender.
It is or should be obvious that the surrender of a child by its parent, whatever the circumstances or reason, has elements of tragedy in it and that pain, feelings of guilt, and suffering will *189 not be avoided whatever course is taken. And, of course, the foster parents who hope to adopt the child are necessarily touched by the tragedy, guiltless and otherwise uninvolved though they be, if perchance the child is wrested from them on the annulling of a surrender.
A further consideration turns on this court’s limited power of review. Where, as here, findings of fact are affirmed by the Appellate Division in a civil matter, the court is bound, by constitutional mandates, to accept those facts. Only questions of law are left for its review. As a consequence, any findings of fact involved in the rendering of the surrender, turning on the mother’s then state of mind, or on her fitness to rear her child, are before this court as immutable premises, from which it may only start its review of the applicable questions of law.
The infant child was born on May 18, 1970, to Olga Scarpetta, who was unmarried and 32 years old. She had become pregnant in her native Colombia by a married Colombian in the summer of 1969. Seeking to minimize the shame of an out-of-wedlock child to herself and her family, Miss Scarpetta came to New York for the purpose of having her child. She was well acquainted with this country and its language. She had had her early schooling in New Jersey and her college education in California. Indeed, she had been trained in the social sciences.
Four days after the birth of the child, she placed the infant for boarding care with Spenee-Chapin Adoption Service, an agency authorized by statute to receive children for adoption. Ten days later,,a surrender document was executed by Miss Scarpetta to the agency, and on June 18, 1970, the baby was placed with a family for adoption. Five days later, on June 23, 1970, the mother repented her actions and requested that the child be returned to her.
After several unsuccessful attempts to regain her child from the agency, the mother commenced this habeas corpus proceeding. Before the surrender, the mother had had a number of interviews with representatives of the adoption agency. On the other hand, shortly before or after the birth of the child, her family in Colombia, well-to-do, and devout in their religion, were shocked that she should put out her child for adoption by strangers. They assured her of their support and backing and urged her to raise her own child.
*190 Special Term, “ [a]fter considering all the facts,” concluded ‘ ‘ that the child should he forthwith returned to petitioner, its natural mother. ’ ’ Following unanimous affirmance by the Appellate Division, we granted leave to appeal.
The resolution of the issue of whether or not a mother, who has surrendered her child to an authorized adoption agency, may regain the child’s custody, has received various treatment by the legislatures and courts in the United States.[1] At one extreme, several jurisdictions adhere to the rule that the parent has an absolute right to regain custody of her child prior to the final adoption decree.[2] On the other hand, some jurisdictions adhere to the rule that the parent’s surrender is final, absent fraud or duress.[3] The majority of the jurisdictions, however, place the parent’s right to regain custody within the. discretion of the court[4]—the position which, of course, our Legislature has taken. The discretionary rule allows the court' leeway to approve a revocation of the surrender when the facts of the individual case warrant it and avoids the obvious dangers posed by the rigidity of the extreme positions.[5]
In New York, a surrender executed by a mother, in which she voluntarily consents to a change of guardianship and custody to an authorized agency for the purpose of adoption, is expressly sanctioned by law. (Social Services Law, § 384.)[6] The statute nowhere endows a surrender with irrevocability foreclosing a mother from applying to the court to restore custody of the child *191 to her. In fact, the legislation is clear that, until there has been an actual adoption[7], or the agency has met the requirements of the Social Services Law (§ 384, subd. 4)[8], the surrender remains under, and subject to, judicial supervision.
Inherent to judicial supervision of surrenders is the recognition that documents of surrender are unilateral, not contracts or deeds, and are almost always executed under circumstances which may cast doubt upon their voluntariness or on understanding of the consequences of their execution. Indeed, no one could reasonably urge that the Legislature enact a statute or that a court decide that the natural mother be prevented from establishing that her surrender was not the voluntary act of a competent person. Of necessity, therefore, there is always an issue about the fact of surrender, document or no document. On the other hand, the courts have the strongest obligation not to permit surrenders to be undone except for the weightiest reasons. And, to reflect such a view, “ the Legislature has gone to great pains to circumscribe, in connection with adoption, the rights of parents who have surrendered their child to an authorized agency, and * * * has gone to equal pains to define their rights to custody prior to adoption. The related statutes, which are at least presumptively an embodiment of the social judgment and conscience of the community, form a well-integrated, compact and uncomplicated procedure, which bears the impress of careful thought and intelligent planning.” (People ex rel. Grament v. Free Synagogue Child Adoption Committee, 194 Misc. 332, 336.)
Having the power to direct a change of custody from the agency back to the natural parent, notwithstanding the docu *192 ment of surrender, the court should exercise it only when it determines ‘ ‘ that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child.” (Social Services Law, § 383, subd. I.)[9] Accordingly, the sole issue before us on this appeal is whether there is any evidence in the record to establish that the interest of the child will be promoted by returning the child to the natural mother.
It has repeatedly been determined, insofar as the best interests of the child are concerned, that “ [t]he mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties arid privileges of parenthood.” (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 468; see People ex rel. Anonymous v. Anonymous, 10 N Y 2d 332, 335; People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542; People ex rel. Beaudoin v. Beaudoin, 193 N. Y. 611, affg. 126 App. Div. 505; Matter of Livingston, 151 App. Div. 1, 7; cf. Matter of Gustow, 220 N. Y. 373.) It has been well said that “ the status of a natural parent ” is so important that in determining the best interests of the child, it may counterbalance, even outweigh, superior material and cultural advantages which may be afforded by adoptive parents * * * For experience teaches that a mother’s love is one factor which will endure, possibly endure after other claimed material advantages and emotional attachments may have proven transient.” (People ex rel. Grament v. Free Synagogue Child Adoption Committee, supra, at pp. 337-338.) And, indeed, as recently as 1963, the Legislature expressed its approval of this decisional rule that between parent and non-parent the parent is preferred”. (Report of Joint Legislative Committee on Matrimonial and Family Laws, N. Y. Legis. Doc., 1963, No. 34, p. 91.)
*193 The primacy of status thus accorded the natural parent is not materially altered or diminished by the mere fact of surrender under the statute, although it is a factor to be considered by the court. To hold, as the agency suggests — that a surrender to an authorized adoption agency constitute^, as a matter of law, an abandonment—would frustrate the policy underlying our legislation (Social Services Law, § 383, subd. 1), which allows a mother to regain custody of her child, notwithstanding the surrender to the agency, provided, of course, that there is some showing of improvidence in the making of the surrender, that the interest of such child will be promoted and ‘1 that such parent is fit, competent and able to duly maintain, support and educate such child.” Nor do we perceive any distinction, in principle, between the effect of a surrender to an authorized agency and of a surrender to an individual. ‘1 The policy urged that, if surrender may be undone, authorized agencies will be inconvenienced or even frustrated in their placement of children is not a sufficient counterweight. The fact of relationship between a natural parent and child ought not to be subordinated to such considerations, important as they are.” (People ex rel. Anonymous v. New York Foundling Hosp., 17 A D 2d 122, 125, affd. 12 N Y 2d 863.)
Consequently, to give the fundamental principle meaning and vitality, we have explicitly declared that “ [e]xcept where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s welfare compels awarding its custody to the nonparent.” (People ex rel. Kropp v. Shepsky, supra, at p. 469.)[10] In determining *194 fitness, it is obvious that a mother who is “ a drunkard, an incompetent, a notoriously immoral person, cruel or unkind towards [her] child ” (Matter of Gustow, 220- N. Y. 373, 377), or whose conduct evinces indifference or irresponsibility (Matter of Cleaves, 6 A D 2d 138) would not be a proper person to assume the duties of motherhood. Another significant factor to be considered is the “motivation of the mother in seeking return of the child. It is recognized that very often there is a substantial risk of improper motivation. In such case the authorized agency and the court must be especially alert not to permit the improper motivation to endanger the interests of the child or lead to any other noxious consequence. As important as this factor is, however, it is also true that the change of mind by a natural mother is not an evil thing. Instead, the change of mind is to be accorded great sympathy, and, in a proper case, encouragement and favorable action.” (People ex rel. Anonymous v. New York Foundling Hosp., supra, p. 125.)
In no ease, however, may a contest between a parent and non-parent resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child. (People ex rel. Portnoy v. Strasser, 303 N. Y. 539, supra.) It may well-be that the prospective adoptive parents would afford a child some material advantages over and beyond what the natural mother may be able to furnish, but these advantages, passing and transient as they are, cannot outweigh a mother’s tender care and love unless it is clearly established that she is unfit to assume the duties and privileges of parenthood.
We conclude that the record before us supports the finding by the courts below that the surrender was improvident and that the child’s best interests—moral and temporal—will be best served by its return to the natural mother.
Within 23 days after the child had been given over to the agency, and only 5 days after the prospective adoptive parents had gained provisional custody of the child, the mother sought its return. If the matter had been resolved at that time, much heartache and distress would have been avoided. However, since the child was not returned, the mother had no alternative but to commence legal proceedings to regain its custody, and this she did without delay.
*195 In revoking the surrender and directing the return of the child to the mother, the trial court held that the mother was ‘£ motivated solely by her concern for the well-being of her child.” Moreover, the evidence fully supports the conclusion that the mother 1 ‘ has adequately stabilized her own relationships and has become stable enough in her own mind to warrant the return of the child to her.” No finding of present or prospective unfitness has been made against the mother. On the contrary, the record discloses that she is well educated, financially secure, and in a position to properly assume the care, training and education of her child.
Concluding as we do that the record supports the determination that the child’s interests will be promoted by the award of its custody to the mother, we turn to the remaining issue of whether the prospective adoptive parents were entitled to intervene in this proceeding, as a matter of law, pursuant to OPLB 1012 (subd. [a], par. 2).
It cannot be doubted that the public policy of our State is contrary to the disclosure of the names and identities of the natural parents and prospective adoptive parents to each other.[11] Sections 383 and 384 of the Social Services Law are also reflective of this settled public policy. Since the relationship under section 384 is exclusively between the parent or parents and the adoption agency, and the Legislature has not deemed it appropriate for the prospective adoptive parents to be parties to the proceeding pursuant to section 383, the .agency acts as an insulating intermediary, ensuring by the separation of the natural parents and prospective adoptive parents the secrecy necessary to prevent the strife and harassment that could be caused by a parent who institutes a proceeding merely to learn the identity of the prospective adoptive parents.
To allow the prospective adoptive parents to intervene as a matter of right, thereby assuming all the rights of other parties to the action, would necessarily lead to disclosure of the names of the natural parents and prospective adoptive parents to each other. In view of the statutory scheme enacted by the Legislature to guard against such disclosure, and the settled public pol *196 icy, we are unwilling to hold that the prospective adoptive parents are entitled to intervene.
Similarly, we find no merit to the contention that the failure to allow the prospective adoptive parents to intervene in the instant proceeding deprived them of due process of law so as to render the court’s determination awarding custody of the child to the mother, constitutionally invalid. The prospective adoptive parents do not have legal custody of the baby. Spence-Chapin, the adoption agency, by virtue of the mother’s surrender, was vested with legal custody. (Social Services Law, § 383, subd. 2; see, also, Matter of Jewish Child Care Assn. [Sanders], 5 N Y 2d 222, 229.) The agency, in turn, had placed the baby with the prospective adoptive parents pursuant to an arrangement reached between them, for the purpose of prospective adoption of the child. This arrangement is, of course, subject to our adoption statutes, and in no way conveys any vested rights in the child to the prospective adoptive parents. (See, e.g., Domestic Relations Law, §§ 112, 114.) It follows, therefore, that, in not being permitted to intervene, they are not deprived of a protected interest, as contemplated by the Constitution.
The order of the Appellate Division should be affirmed, without costs.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Gibson concur.
Order affirmed.

. See Katz, Law of Adoption, 51 Geo. L. J. 64, 87; Comment, Revocation of Parental Consent to Adoption: Legal Doctrine and Social Policy, 28 U. Chi. L. Rev. 564.

. See, e.g., In re Baby Girl Larson, 252 Minn. 490, but cf. Minn. Stat. § 259.24, subd. 6, [1969]; S. D. Code, tit. 14, § 14.0406 [1939]. In North Carolina and Tennessee, the right is continuous up until a certain period of time before the issuance of the final decree. (N. C. Gen. Stat., § 48-11 [1966]; Tenn. Code Ann., § 36-117 [1962].)

. See, e.g., Catholic Charities v. Harper (161 Tex. 21); Gonzales v. Toma (330 Mich. 35); La. Rev. Stat. Ann., tit. 9, § 404 (1965).

. See Katz (supra, n. 1), at p. 88.

. See Katz (supra, n. 1), at pp. 89-90; Clarke, Social Legislation (2d ed., 1957), 320; U. S. Children’s Burehu, Essentials of Adoption Law and Procedure (Publication No. 331,1949), p. 14.

. The agency is charged thereafter with the care and supervision of the child, unless the child is adopted. (Social Services Law, § 383, subd. 2; see People ex rel. Anonymous v. Perkins Adoption Soc., 271 App. Div. 672, 674.)

. Domestic Relations Law (§ 112, subd. 6) provides: “ Where the adoptive child is less than eighteen years of age, no order of adoption shall be made until such child has resided with the adoptive parents for at least six months unless the judge or surrogate in his discretion shall dispense with such period of residence and shall recite in the order the reason for such action.”

. Social Services Law (§ 384): “4. Upon petition by an authorized agency, a surrogate or judge of the family court may approve such surrender, on such notice to such persons as the surrogate or judge may in his discretion prescribe. No person who has received such notice and been afforded an opportunity to be heard may challenge the validity of a surrender approved pursuant to this subdivision in any other proceeding. However, this subdivision shall not be deemed to require approval of a surrender by a surrogate or judge for such surrender to be valid.”

. Social Services Law (§ 383, subd. 1): “The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except upon consent of the court, public board, commission, or official responsible for the commitment of such child, or in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child. The name of such child shall not be changed while in the custody of an authorized aegncy.”

. And, in our later decision in People ex rel. Anonymous v. Anonymous {supra, at p. 335), we wrote, in like fashion, that “where the contest for the custody of a child is between parent and nonparent, ‘the primacy of parental rights may not be ignored’ (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469, supra), but it has never been held or suggested that the child’s welfare may ever be forgotten or disregarded. In other words, the law presumes that it is in the child’s best interests that he be raised by his natural parent, but this presumption fails when it is proved that the parent has abandoned the child or is not fit to rear him. ‘ The mother or father has a right to the care and custody of a child, superior to that of all others, unless ’, we pointed out in the Kropp case (305 N". Y. at p. 468), ‘he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood.’ ”

. See, e.g., sections 111 (subd. 4) and 112 (subd. 4) of the Domestic Relations Law.