Nanette Dembitz, J.
The infant subject of the private-placement adoption petition herein was born on September 2, 1974; she has been in petitioners’ home since September 4, 1974, when her placement therein was arranged by petitioners’ attorney. The issues herein are whether the natural mother’s consent to petitioners’ adoption of her child was valid initially; whether, if it was valid, the court should permit its revocation; and whether the welfare and best interests of the infant require her removal from petitioners’ home, pursuant to sections 115 and 116 of the Domestic Relations Law.
The procedure prescribed by section 115-b for revocation of a specific form of consent by a natural parent, is inapplicable herein, since no such consent was procured, given, or filed. Compare Matter of Anonymous (77 Misc 2d 323). And paragraph 4 of section 115-b provides that the section does not affect the powers of, the court set forth in other sections, nor its common-law powers with respect to revocations of consent.
1. Invalidity of Natural Mother’s Consent.
In accordance with subdivision 3 of section 115 of the Domestic Relations Law and customary practice, the natural mother appeared before the court on February 26, 1975 "for examination before the judge” with respect to her consent to the adoption. See Matter of Anonymous (60 Misc 2d 854). Since the natural mother is a minor now aged 16, and was 15 at the time of the infant’s birth and her alleged consent to its adoption, her guardian (the natural grandmother) also appeared. The infant having been born out-of-wedlock and her father’s name being unknown, only the consents of the natural mother and her guardian are required. (See Domestic Relations Law, § 111, subd 3.)
The petitioners are a married couple, the husband being 56 and the wife 63 (born April 15, 1911), neither of whom has ever had a child. This opinion will deal with the female petitioner because it is clear that she was the prime mover in' securing the infant for adoption and would have primary *537 responsibility for her care and development. The natural mother’s affidavit of consent filed with the adoption petition, stated only that the petitioners’ attorney had "advised concerning the basic facts, physical, economic, religious, moral and temporal circumstances of the adopting parents which were satisfactory to me.” Because of the vagueness of this statement and the peculiarity of the adoption by a woman of 63 of an unrelated new-born infant, the court asked the natural mother if she had known of the age of the petitioning female when she gave her affidavit of consent to the adoption. She replied that she had not known petitioner’s age and had only been told in general that petitioners were a desirable couple. The grandmother then replied to the same question with the answer that she had known of the petitioner’s age.
Thereafter the court received a letter dated February 28, 1975 from an attorney, stating that the natural grandmother had been uninformed of the female petitioner’s advanced age prior to coming to court on February 26, 1975; that she would not have consented to an adoption by petitioners or advised her daughter to so consent if she had had knowledge of petitioner’s age; that her misrepresentation on February 26th to the court was due to her bewilderment and distress; that she greatly regretted the misrepresentation; and that she and her daughter wanted to withdraw their consents.
At the continued hearing on March 12, 1975, the evidence clearly established as follows: neither the natural mother nor grandmother knew or suspected the female petitioner’s age; that they are certain they would not have consented to the infant’s adoption by petitioners had they known of it; and that they emphatically want to withdraw their consent because of it. The grandmother elaborated by testifying that she trusted the representation of the petitioners’ attorney that the petitioners were desirable adoptive parents and assumed that the petitioning adoptive mother was younger than she is. Under the circumstances and considering that in hundreds of private-placement nonrelative adoptions the court has never seen an age disparity between infant and adoptive parent of the extreme type here present, the court finds that the grandmother’s assumption was a normal and reasonable one. Indeed, petitioners’ attorney himself made it clear that he had evidenced a sympathetic concern for the natural mother and grandmother and had succeeded in persuading them to have confidence in his selection of adoptive parents (although in his *538 opinion, as he stated in court, his only duty was to his clients, the petitioners). He further indicated that he himself viewed the female petitioner’s advanced age as an unusual factor, but nevertheless did not disclose it. Certainly such a disclosure is within the ambit of the statement in the affidavit prepared by petitioners’ attorney for the natural mother’s signature, that she was advised of the "physical * * * and temporal circumstances of the adopting parents”.
In People ex rel. Scarpetta v Spence-Chapin Adoption Serv. (28 NY2d 185, 191) the court pointed out: "Inherent to judicial supervision of surrenders is the recognition that documents of surrender are unilateral, not contracts or deeds, and are almost always executed under circumstances which may cast doubt upon their voluntariness or on understanding of the consequences of their execution.” Here the circumstances of the purported consents not only "cast doubt upon their voluntariness” but positively establish that they were based on a mistake of fact. It is clear that they were given improvidently; that they cannot be deemed knowing and "truly voluntary” consents (compare People ex rel. Louisa v Faella, 37 AD2d 598); and that they must be held invalid. They were the result of overreaching, if not implicit deception and fraud, by petitioners’ attorney. (See People ex rel. Scarpetta v Spence-Chapin Adoption Serv. 28 NY2d 185, 188, 191, 193, 194-195, supra.) Even if an order of adoption has actually been made (as it has not herein), it may be vacated for fraud, newly discovered evidence or other sufficient cause (Domestic Relations Law, § 114).
Even aside from the special factor of nondisclosure of the female petitioner’s age, the evidence shows that the natural mother’s consent cannot be deemed truly voluntary. She was not only a "very frightened girl” (see Matter of Musso v McAlpine, 36 AD2d 901) and under great pressure (see People ex rel Kropp v Shepsky, 305 NY 465, 469), but she testified that she was in such a confused and disturbed state (and relied so much on petitioners’ attorney) that she never read the affidavit she signed. Apposite is the court’s statement in Matter of Anonymous (60 Misc 2d 854, 859): "It seems to the court that public policy requires that petitioner have the burden of affirmatively showing that a consent of an infant parent was obtained voluntarily with full knowledge of its effect and understanding of the consequences, and with adequate independent advice from sources other than petitioner’s *539 own attorney or agent. (See Matter of Creekmore, 1 NY2d 284.) Petitioners have not met that burden.”
The evidence is also clear, though not conclusive, that the purported affidavits of consent were postdated and notarized by petitioners’ attorney (who also acted as notary), with a date after the infant’s birth though in fact signed by the natural mother and grandmother a month prior thereto. Such misrepresentation with respect to private-placement adoption affidavits has occurred in other cases (see Matter of Anonymous, supra, p 856) and should be deemed in itself to invalidate the consent.
2. Welfare and Best Interests of Child.
Even assuming arguendo that the consents could be considered valid at their inception, under the applicable precedents the court must permit their revocation because the best interests of the infant would be served thereby. (See People ex rel. Stone v Maglio, 62 Misc 2d 292, 294; Scarpetta v SpenceChapin Adoption Serv., supra, p 194.) The question of whether the court should permit a revocation in the best interests of the child involves the same considerations as the question of whether the child should be removed from the petitioners’ home pursuant to subdivision 2 of section 116 of the Domestic Relations Law to promote her best interests and welfare. (The hearing held on March 12, 1975 was originally called pursuant to subdivision 2 of section 116 before the court received the letter dated February 28, 1975 from the natural grandmother’s attorney with regard to her desire to revoke her consent.)
The natural mother’s desire to revoke her consent is based not only on her mother’s view but on her own independent judgment, based on her own experience as a child and an adolescent, of the importance of a mother within the age range in which procreation is biologically possible ("When the baby is 10, her mother would be 73,” was, for example, one of the natural mother’s statements in expressing her objection to adoption by petitioners.) Expert testimony at the hearing of March 12, 1975 established that the one objective standard which is generally recognized with respect to desirable nonrelative adoptions of new-born infants, is that the maximum maternal age is 40 (approximately the maximum biological age at which procreation is possible). The reason is a simple one: most children are raised by their biological mothers; and adopted child should not have to feel — insofar as it can be
*540 avoided — that he is unlike other children; he should not be given the psychological burden of an unrelated parent who is of an age to be his grandparent or great-grandparent. See People ex rel. Anonymous v Louise Wise Servs. (21 AD2d 327, 329) as to the problem of an adopted child’s sense of identity. Further, there are of course the purely physical and material risks from the lesser life-health expectancy of persons over 60. Here, incidentally, the only health certificates for petitioners submitted in support of the adoption petition were subscribed by the female petitioner’s brother and cannot be accepted as unbiased.[1] And of course the greater likelihood that a woman younger than 60 would have more capacity to minister to a growing child’s many and unceasing material and immaterial needs is clear.
This court does not hold that advanced age would necessarily disqualify nonrelatives from adopting a new-born infant, but that some exceptional qualities must be shown to compensate for depriving the child of adoption by one of the many highly fitted youthful couples clamoring to adopt an "easy-to-place” infant like this one (see section 3 below). There are no such exceptional qualities in this case. The best that could be said for the adoption was that the female petitioner was well-preserved, energetic and youthful in outlook (though in fact in her appearance and carriage she seemed to the court at least her chronological age if not more); that a younger sister, her husband, and children visited frequently; that the sister was willing to take care of the child if the female petitioner died or became incapacitated; that petitioners were very happy to have the child, showed her affection, and provided good care for her. That affection and care will be given an infant who has been recently obtained for adoption goes without saying; certainly it would not have been procured unless desired and unless there was provision for its care. However, the court’s duty is not merely to consider the care given the infant for the first six months of her life by petitioners, nor indeed the care they would be able to give or secure for her for the next six months (petitioner having employed "a middle-aged woman” to help with her care). The female petitioner’s "attained age” in relation to such "a temporary assignment * * * *541 is of different consideration than when evaluated for the lifetime assignment in prospective adoption.” (Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204.)
No circumstance triggering the female petitioner’s effort to adopt a child at this stage of her life has been suggested; apparently, the imminence of old age was the stimulus. One must sympathize with her present predicament (though her attorney stated that she knew there was a risk of the denial of the adoption petition). In any event, the State’s duty is to secure the best interests of the child, which were disregarded by petitioners’ attorney in his view that his duty was only to his clients. He does not appear to have exemplified the careful and wise self-policing which is sometimes said to animate attorneys in private-placement adoption practice. As to placement standards in the "Gray Market,” see Matter of Infant H (69 Misc 2d 304, 308, ns. 5, 6).
3. Placement with Authorized Adoption Agency.
The natural mother and grandmother stated to the court that they wish to surrender the infant for adoption to an authorized adoption agency of their religious faith (Catholic), knowing that all authorized agencies have long waiting lists of highly desirable adoptive parents eager to adopt normal newborn infants like this infant. Their intention is based on their continued view that it is not in the infant’s interests for them to raise her; that they had originally entered into a private-placement adoption because it spared them from discussions about the mother’s out-of-wedlock pregnancy at a time when they were distressed about it, and because of their confidence in the promise of petitioners’ attorney of a desirable home; that they still are concerned about the infant’s future, and in view of the unexpected and unfortunate result from private placement through petitioners’ attorney, they now want to make an agency placement.
The natural mother’s rights with respect to her child, when she has given an invalid adoption consent or revoked it, undoubtedly include the right to surrender it to an agency rather than to assume custody herself if she believes such surrender to be in the child’s interests. Thus, while the reported cases of invalid or revoked consents have involved the return of the child to the natural mother, the principles expounded therein are fully applicable here.
Further, section 115-b respecting revocations (while not *542 governing the details of procedure herein) expresses an applicable principle in providing that the court shall determine whether the revocation shall be given effect and whether the best interests of the child "will be served by returning custody of the child to the parent or by placement of the child with an authorized agency” (Domestic Relations Law, § 115-b, subd 3, par [d] cl [ui]). Subdivision 2 of section 116 similarly provides: "If the court is satisfied that the welfare of the child requires that it be removed from the home, the judge or surrogate shall by order remove the child from the home of the petitioners and return the child to a natural parent or place the child with an appropriate authorized agency, or, in the case of a surrogate, transfer the child to the family court.” It is self-evident that it is not to the child’s interest to return her to the custody of the natural mother who has decided that she wishes the child adopted by a couple meeting agency standards of desirability.
It is true that it would have been better for the infant if she had been placed in an appropriate adoptive home initially so that her movement now would be unnecessary. However, an expert witness’ testimony indicated that a removal from one home to another after only six months would not be deemed to impair significantly the infant’s prospects for healthy and psychologically sound development, and authoritative studies establish that even an older child can adjust well to a replacement if the receiving parents are well-selected. Indeed, this court has had personal experience with this phenomenon (see Matter of Efrain C, 63 Mise 2d 1019, in which a 2 Vi-year-old child was placed for adoption; this court followed the child’s progress in adoption). (See Jaffee and Fanshel, How they Fared in Adoption [1970], ff; Kadushin, Adopting Older Children [1970].) The possibility of a child’s replacement is unavoidable under New York’s system of permitting an infant’s initial placement to rest wholly in the hands of an adoption petitioner’s attorney, and imposing supervisory duties on government agencies only thereafter.
The petition is dismissed; an order to remove the infant and place her with the Catholic Guardian Society is issued herewith.

. The brother, who testified for petitioners, apparently is in his 70’s (he testified he had practised pediatrics 50 years ago), is a bachelor very much attached to his sister, a constant visitor in her home, and personally keenly interested in the grant of the adoption.