OPINION OF THE COURT
Nanette Dembitz, J.
In this consolidated habeas corpus and adoption proceeding, a biological mother petitions to secure the custody of her infant, whom she released at birth to preadoptive parents; they seek to retain his custody and also adopt him. The adoption petition must be denied for failure to meet the statutory requirements for an adoption. Further, this court must under the constraint of appellate precedents grant custody to the mother, because she appears to be “fit” in the respects that this term has been judicially defined.
However, for reasons summarized below (point II), the court finds that the welfare of the two-year-old infant herein will be seriously endangered by a court order for his transfer from the preadoptive couple to the mother. Under this extraordinary circumstance, the customary rule of priority for a parental claim to custody, presents an unprecedented question of a child’s constitutional right to the State’s concern for his welfare (point III below).
*249 I. STATUTORY REQUIREMENTS FOR ADOPTION
The lengthy evidence shows that petitioner mother,[1] an illegal immigrant from El Salvador, unmarried and working as a domestic in California, decided four or five months before her baby’s birth to permit respondents to adopt it. Her reasons were that the baby’s father refused to marry her, and that she opposed abortion because of her religion. When the baby was born on July 16, 1980, petitioner decided because of the planned adoption not to see him; she authorized respondents to care for him in the hospital the day after his birth, and to remove him from the hospital the following day. He has lived with them ever since.
Respondents’ California attorney planned to secure petitioner’s unequivocal written consent to the adoption in an appearance in a California court after the baby’s birth. However, by the time a Judge became available, petitioner changed her mind about appearing and about the adoption.

Interpretation of Statutory Consent Requirement

Respondents argue that the statutory requirement for the biological mother’s consent to her child’s adoption (see Domestic Relations Law, § 111, subd 1, par [c]), is satisfied by her agreements to his placement with respondents for adoption or for adoption planning. These documents should, respondents contend, be construed as the statutorily required consents pursuant to the parol evidence rule, because of petitioner’s intention to consent to the child’s adoption.
Respondents are correct in their factual contention as to petitioner’s underlying purpose. Among the witnesses from California to whom petitioner asserted her adoption decision, the most important was the social worker in the hospital of delivery, who discussed with petitioner her option to keep the baby during the two months before his birth. The worker’s undenied, credible and convincing testimony was that petitioner in all interviews adhered to her adoption decision, and was sad but “firm” about it on the day the baby left the hospital with respondents pursuant to the release she signed on that day. Nor is there any *250 justification for petitioner’s suggestion that respondents’ California attorney was overreaching or unfair. The attorney cannot be faulted for the fact that “[6] “ ‘Contemplation of the surrender of one’s own child is in many, if not all, cases a cause of emotional and mental stress””” (Podmore v Our Lady of Victory Infant Home, 82 AD2d 48, 52).

Parol Evidence Rule

Although the documents on which respondent relies undoubtedly were executed for the purpose of advancing the intended adoption, respondent’s argument for the application of the parol evidence rule must be rejected. Under that rule, proof of intention is only “admissible to explain ambiguities” in an instrument. (67 Wall St. Co. v Franklin Nat. Bank, 37 NY2d 245, 249; see, also, Laba v Carey, 29 NY2d 302, 308; Nichols v Nichols, 306 NY 490,496.) There is no ambiguity however, with respect to the omission from petitioner’s signed agreements of a consent to adoption.
Further, although there is no explicit statutory prohibition on use of an oral consent, sections 111, 112,115,115-b, and 116 of the Domestic Relations Law, read together, clearly manifest the Legislature’s intent to authorize adoptions only on written consent.
While an adoption can be effected without the consent of a parent who has abandoned a child, respondents have been unable to show an abandonment by petitioner within the meaning of section 111 (subd 2, par [a]; subd 6, par [b]) of the Domestic Relations Law as those provisions have been construed in Corey L v Martin L (45 NY2d 383). Since adoption is “purely a statutory matter”, the legislative requirements must be scrupulously enforced. (See Matter of Malpica-Orsini, 36 NY2d 568, 570, app dsmd 423 US 1042.) Because neither a consent nor an abandonment has been established in accordance with statutory criteria, respondents’ petition for adoption must be denied.
II. CUSTODY OF CHILD
Respondents argue that they should retain custody of the child — an issue controlled by common law and constitutional principles rather than statute, even if adoption is denied. There are obvious disadvantages to the child in the *251 equivocal legal status resulting from such a ruling; but under the circumstances summarized below, it appears to be the least detrimental alternative from the standpoint of his welfare. (As to the denial of a biological mother’s custody petition despite denial of the custodians’ adoption petition, see Matter of Bistany, 239 NY 19,24; People ex rel. Anonymous v Anonymous, 14 AD2d 41, 44-45; Matter of Cohen, 155 Misc 202.)
The evidence clearly and convincingly establishes the following custodial facts. Respondents, a childless married couple in their 30’s with a stable, harmonious, child-centered household (he an architect, she a free-lance textbook editor; like petitioner Catholic and identified with their parish church), unquestionably are highly desirable custodians for the child. Under their beneficent love and commitment to his welfare, his development has been optimal. According to reliable and convincing expert testimony, disruption of the infant’s secure attachment (“bonding”) to respondents would undoubtedly cause him short-term distress and might result in serious and permanent emotional, psychological and intellectual damage; the gravity of his injury would largely depend on the circumstances of his new life with petitioner. The evidence shows that those circumstances are uncertain, unstable, and in all probability bleak and injurious.

Petitioner’s Lack of Any Stable Custodial Plan

Petitioner has for some years taken care of children as a domestic worker, and she is well regarded in that position. However, the evidence establishes that she has no stable plan for the child. She therefore lacks an essential qualification for a grant of custody. (See People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185, 195; People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d 122, 126.)
After petitioner’s persistent testimony that she intended, if she secured the child’s custody, to take him forthwith to El Salvador, she suddenly switched to a plan to take him to California where the sister of the baby’s *252 father would help her,[2] and from that to a plan to marry and to live in California with the baby’s father, a California resident. (The father had in 1980 executed a consent to the child’s adoption.) At a rehearing the uncontradicted and reliable evidence established that the father married another woman about a month after the first hearing herein, that they had been living together before marriage, and are parents of two premarital children; the evidence indicated that petitioner knew of the father’s disinterest in her at the time of her testimony about their imminent marriage. Petitioner then testified that she and the baby’s father’s sister, who also works as a domestic, would arrange their working hours so as to share the burden of caring for the child in California. However, there was no indication that the sister had done anything more than verbalize a willingness to permit petitioner to live with her. And the evidence showed that petitioner must work to live, because she is an illegal immigrant ineligible for public assistance.
Despite sympathy for the petitioner’s desire for the child’s custody and for her economic handicaps, the conclusion is inescapable: To grant custody to petitioner means that the child will go from a stable, devoted two-parent home, to unsettled, precarious care, and to a very real possibility of involuntary but actionable parental neglect as well as a childhood in the foster homes of strangers. These detrimental circumstances would, judging from the expert testimony discussed above, intensify and solidify the child’s injury from the severance of his bonding to respondents.
III. RIGHTS OF THE CHILD
In Dickson v Lascaris (53 NY2d 204, 208), the Court of Appeals recently held that a parent is only “ ‘disqualified by gross misconduct’” from gaining custody of a child. (See, also, Matter of Leon RR., 48 NY2d 117, 124.) Under the constraint of the Dickson ruling and the restraint expected of a lower court, this court must award custody to *253 the petitioner. However, in view of the resulting detriment to the child, grant of the mother’s petition appears to raise an unprecedented issue as to a child’s constitutional rights. While decision of this novel constitutional question is more appropriate on the appellate than the trial level (an appeal by the losing party being in prospect), it is proper for this court to point out the significance and novelty of the issue.
A premise in Dickson was that “both interests [those of parent and child] * * * ordinarily converge” (53 NY2d, at p 208). However, as the Supreme Court said with reference to the presumption that “parents * * * act in the best interests of their children * * * As with so many other legal presumptions * * * reality may rebut what the law accepts as a starting point.” (Parham v J.R., 442 US 584, 602.) In the instant case the danger to the child’s welfare from a transfer of custody to his mother, is so unmistakable that their interests cannot be reconciled on the basis of a presumed convergence.
Because of the usual unity of interest between parent and child, there have only been a few occasions for judicial consideration of a constitutional conflict between the parental right to custody or control and the child’s welfare. In Matter of Bennett v Jeffreys (40 NY2d 543, 546) — an instance of such consideration — the court pointed out that the constitutional rights of children, established in a series of cases concerning government action,[3] must also be respected in custody controversies between parents and non-parents. And in Parham v J.R. (442 US 584), involving parental commitment of a child to a hospital for treatment of mental illness, the Supreme Court accepted the lower court’s view that the child’s “liberty interest is implicated” (442 US, at p 597), and recognized the need for protection of the child’s constitutional rights even against “traditional parental authority” (442 US, at p 606). (See, also, Bellotti v Baird, 443 US 622; Planned Parenthood of Missouri v *254 Danforth, 428 US 52, 74-75, upholding the child’s due process rights as against the parental right to control.)
Accordingly, it seems clear that a child’s liberty interests under the due process guarantee include his interests in State-ordered movement of his person and transfer of control over him from one custodian to another. And it would seem that those liberty interests must prevail over parental rights in a case like the instant one where 4he child’s welfare would be seriously endangered by a grant of custody to the mother.[4] The child’s right to freedom from a damaging custody order can be regarded as the reciprocal of the State’s fundamental duty, repeatedly emphasized throughout the law, to protect children against harm, including harm by parents.[5]
It is true that in Smith v Organization of Foster Families (431 US 816, 840-841), the Supreme Court reversed the lower court’s conclusion that a child’s liberty interest was involved in the State’s termination of his relationship with his foster parents. However, that case is clearly distinguishable from the instant one in that the Supreme Court grounded its opinion largely on the fact that the relationship was established and limited by the State’s contract with the foster parent for temporary foster care. State action in the instant case would instead impact by severing, to the child’s damage, a relationship privately initiated by the child’s parent.
Judicial authority to subordinate the parent’s interest to the child’s interest must of course be narrowly channeled (see Dickson v Lascaris, 53 NY2d 204,209). However, there is nothing vague or subjective about petitioner’s unstable and precarious circumstances, and about the clear, convincing and definitive proof of her inability to assume *255 custody of the child. While the court had no occasion in Dickson to consider the instant type of unfitness, it seemingly would show “grievous cause or necessity” for denying parental custody (see Dickson v Lascaris, 53 NY2d 204, 208), equally with the “misconduct” to which Dickson referred (53 NY2d, at p 208). Such an interpretation of parental unfitness would permit denial of a parental petition under circumstances of the instant type, and would avoid the constitutional question presented by a court order for a child’s transfer to demonstrably detrimental custody.[6]

. Reference to the parties herein will be made in terms of their positions in the custody case.

. Petitioner’s change of mind cannot be attributed to the military situation in El Salvador since she testified in connection with her plan to take the child there that they would live in an area where there was warfare.

. As against the public schools, which have been viewed as quasi-parental as well as governmental agencies, the child’s liberty interests are also well established. (See Ingraham v Wright, 430 US 651, 662; Goss v Lopez, 419 US 565, 594 [Powell, J., dissenting]; Tinker v Des Moines School Dist, 393 US 503, 524 [Black, J., dissenting]; Ginsberg v New York, 390 US 629, 639.)

. Certainly the child’s constitutionally protected interests should be deemed to include a self-interest in his welfare. (Cf. Bellotti v Baird, 443 US 622, 647-648, 655; Quilloin v Walcott, 434 US 246, 253-255.)

. E.g., Lassiter v Department of Social Servs. (452 US 18, 27); Wisconsin v Yoder (406 US 205); Prince v Massachusetts (321 US 158, 165).
Further, petitioner’s right, weighed against the child’s and the State’s interest in his welfare, seems diminished by the fact that her voluntary and deliberate release of him to respondents for adoption initiated his predicament.

. In addition, this interpretation would establish greater coherence between the unfitness doctrine and the principle that a parent must in order to obtain a child’s custody advance a stable and beneficial plan for his care. (See People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 29 NY2d, at p 195; People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d, at p 126.)