In the Matter of the Adoption of Male Infant LANDAVERDE, a Minor Under the Age of 14 years.

CHRISTINA LANDAVERDE, Respondent, v JAMES HOWIE et al., Appellants.

First Department, July 14, 1983

### APPEARANCES OF COUNSEL

*Jack G. Goldberg* of counsel (*Arlen S. Yalkut* with him on the brief), for respondent.

*Vivian O. Berger* of counsel (*Eric A. Seiff* and *Carolyn H. Henneman* with her on the brief; *Scopetta & Seiff* and *Vivian O. Berger,* attorneys), for appellants.

### OPINION OF THE COURT

ASCH, J.

After a full exposition of the facts, the dissent has decided that Christina Landaverde, the natural mother of the child herein, should lose her right to her son because of the "extraordinary circumstances" (see *Matter of Bennett v Jeffreys,* 40 NY2d 543) present in this case.

The dissent cites the "extraordinary circumstances" as being her "poverty * * * only when coupled with all the other inadequacies apparent in her situation." These include the circumstances that she speaks little English, is an alien subject to deportation and "has no real notion of what she will do with the boy, or how she will care for him."

The minority has sought a responsible answer to a painful and complex problem, so important to all the parties, especially to the young child. Yet, it is difficult to avoid measuring the relationship of parent and child by our own North American standards of culture, language and nature of family constellation. Very wisely, the law restrains the court from imposing its own values as to what is best for the child except under the most unusual of situations.

The Court of Appeals has laid down the rule that "[i]ntervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstances which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interests of the child and to order a custodial disposition on that ground" (*Matter of Bennett v Jeffreys, supra,* at p 549).

Both the Family Court and this court have expressly found that there has been no surrender, abandonment, persistent neglect or unfitness of the mother. This mother has ever been very devoted, dedicated to the struggle to regain her child — overcoming her lack of language and her paucity of funds, by her trek across America, by her persistent visits to the child, as well as by her legal efforts.

The long chronology documented by the dissent as to the extensive discussions and meetings where petitioner "expressed her determination to have the Howies adopt her baby" all took place *before* the birth of the child while she was afraid and confused about the future. The document she signed titled "Placement for Adoption" *after* the birth

of the child contains the following unequivocal clause: "I understand that this declaration is not a consent to adoption and that in signing this document I retain my legal rights to the custody, control, earnings and support of said child." All the lawyers and social workers assured her that she was not giving away her baby and was reserving her option to change her mind.

Ms. Landaverde communicated with Mr. Manjarrez, the Howies' California attorney, in August, 1980, within a scant three weeks of the birth of her son, and again in October, 1980, both personally and through counsel, requesting and demanding the return of her infant. The delay between that demand and petitioner's arrival in New York to commence this action was characterized by the Family Court as due in part to her California attorney's futile plan to secure the child's return through the California courts, plus her need to save money from her wages for the trip and to arrange for maintenance and legal services in New York. Her petition to regain custody of her son was brought in June, 1981, a few weeks after she arrived in New York.

The trial dragged on over nine months. The appellants and our dissenting brethren urge that the child has spent the entire period of his life — nearly three years — with the Howies. But this delay has been largely caused by protracted court proceedings. In this regard, it is certainly significant that both Susan and James Howie stated in October of 1980 that they were determined not to return the child to Ms. Landaverde whether or not the consents were ever signed. However, the undisputed chronology above shows that the mother has been seeking the return of her son since he was three weeks old. What occurred in this case tracks what the Court of Appeals said in one before it. "[T]here is no basis on this record for finding such a prolonged interruption of custody as to constitute an extraordinary circumstance. As this court recently noted, where a period of separation is attributable to the parent's efforts to regain custody lawfully, that separation is entitled to little, if any, consideration (*Matter of Sanjivini K.,* 47 NY2d 374, 381-382). Although *Sanjivini* involved termination of parental rights, rather than custody, the court

also stated that 'it is doubtful whether it could be found to be in the child's best interests to deny her [parent's] persistent demands for custody simply because it took so long * * * to obtain it legally' (47 NY2d, at p 382). Since a large portion of the separation here occurred during the father's informal and formal attempts to obtain custody, the custodial disruption does not rise to the level of an extraordinary circumstance. Quite bluntly, a child is not a piece of property over whom title may be acquired by adverse possession." (*Matter of Dickson v Lascaris*, 53 NY2d 204, 209-210.)

The minority attempts to make the difficulty that petitioner might or would have in working *and* taking care of her child an "exceptional circumstance". The petitioner works as a domestic. There are literally thousands of single working mothers in this city who are raising young children. Certainly, her financial circumstances should not be held against her. If we resort to the common experience of mankind, it is quite apparent that poverty has rarely been a disqualification for successful parenting.

The mother speaks little English. I doubt the fact that his mother speaks Spanish will weigh that heavily with someone not quite three. And if she is compelled to return to El Salvador without her son, it would mean that she will be permanently separated from him. He would be exiled from his natural family and his cultural heritage. In this context, it seems significant to note that the infant Mauricio has become Nicholas Howie. Certainly, even in El Salvador, undoubtedly there are children who flourish. It is even argued by some that New York is a more dangerous place to grow up.

In addition, I note that the mother, according to the testimony, has been visiting her son regularly once a week, and the "trauma" of her gaining custody might not be quite as serious as it is argued. The dissent emphasizes the testimony of Drs. Porter and Turezki, the former the Howies' pediatrician and the latter a child psychiatrist retained by the Howies. Dr. Turezki did testify that it was "certain that there would be negative short term consequences." However, he conceded on cross-examination that there is a possibility the child could be perfectly normal without

therapy if separated from the Howies. In addition, Dr. Turezki, who had been testifying about the *theoretical* consequences of a change in custody, stated: "I only evidence I do have [*sic*] is that this child is securely attached in a positive home." and in response to the next question "[t]here is no evidence you have seen that this child in this point of life would suffer any detrimental consequences? [if returned to Ms. Landaverde]", the psychiatrist responded "That is right".

The petitioner introduced no psychiatric or social work testimony. All the psychiatric material and the testimony of the trained social worker were introduced by the Howies. With respect to this we have the caveat of the Court of Appeals: "In custody matters parties and courts may be very dependent on the auxiliary services of psychiatrists, psychologists, and trained social workers. This is good. But it may be an evil when the dependence is too obsequious or routine or the experts too casual. Particularly important is this caution where one or both parties may not have the means to retain their own experts and where publicly compensated experts or experts compensated by only one side have uncurbed leave to express opinions which may be subjective or are not narrowly controlled by the underlying facts" (*Matter of Bennett v Jeffreys, supra,* at p 549).

The dissent also relies on the "great confusion" of Ms. Landaverde "over her plans for the child", adverting to the fact that she had set forth three alternatives, one of which — going back to El Salvador — was abandoned, the second — marrying the father of the child — is no longer feasible, and the third — moving in with the father's sister in San Francisco — being deemed "ill-conceived and badly formulated". However, it must be remembered that, as noted, the trial herein lasted nine months and obviously petitioner was exploring different avenues of best caring for her child. In any event, as noted, there were no "extraordinary circumstances, *narrowly categorized*" as required by the Court of Appeals, and thus "it is not within the power of a court * * * to make significant decisions concerning the custody of children, merely because it could make a better decision or disposition" (*Matter of Bennett v Jeffreys, supra,* at p 545; emphasis added).

If we accept the premise that the standard of extraordinary circumstances has been met in this case, then there would be virtually *no* case where such circumstances did not exist. In effect, what the dissent postulates is a standard so all-inclusive that the sole and only determinative in any custody dispute would be the best interests of the child without *any* regard for the rights, interests, etc., of an innocent parent. This standard is not only unconstitutional (see *Stanley v Illinois,* 405 US 645, 651), but contrary to the law both in its historical foundation and in its present application (see *Matter of Bennett v Jeffreys, supra; Matter of Dickson v Lascaris, supra*).

We are instructed by the Court of Appeals that: "Historically, it has been the law in this State that, as between a parent and a third person, parental custody of a child may not be displaced absent grievous cause or necessity (e.g., *Matter of Bennett v Jeffreys,* 40 NY2d 543, 548, *supra; People ex rel. Anonymous v Anonymous,* 10 NY2d 332, 335; *People ex rel. Kropp v Shepsky,* 305 NY 465, 468-469). Although earlier characterized as involving the 'primacy of parental rights' (*People ex rel. Kropp v Shepsky, supra,* at p 469; *People ex rel. Portnoy v Strasser,* 303 NY 539), the rule in actuality is founded upon the 'generally accepted view that a child's best interest [is to be] raised by its parent unless the parent is disqualified by gross misconduct' (*Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204). Rather than artificially exalting the 'rights' of the parent at the expense of the well-being of the child, this rule fosters both interests by recognizing that they ordinarily converge" (*Matter of Dickson v Lascaris, supra,* at p 208).

If the court were to adopt the position urged by the dissent, at best the boy's status would be ambiguous for the rest of his life. The Howies have been granted no more than custody. Their petition to formally adopt this child has been denied and it does not seem likely that as a matter of law they could ever succeed. Mauricio would be severed from his natural mother and yet not be related to the Howies as an adopted son. What King Solomon only threatened to accomplish by a sword, the court would be accomplishing by legal fiat.

Accordingly, the orders of the Family Court (NANETTE DEMBITZ, J.), entered on March 31, 1982, May 28, 1982 and August 20, 1982, which granted the petition of Christina Landaverde for custody of her son and denied the petition of James and Susan Howie for custody or adoption, should be affirmed, without costs or disbursements.

MILONAS, J. (dissenting). The instant case presents one of those tragic instances in which none of the available alternatives provide a satisfactory solution to the problem confronting this court. What must be determined here is whether respondents-appellants Susan and James Howie should retain custody of the child whom they have raised since his birth on July 16, 1980, or whether the boy should be returned to his natural mother, petitioner-respondent Christina Landaverde.

On June 10, 1981, Landaverde filed a petition for custody of her infant son, Mauricio (named Nicholas by appellants), pursuant to section 651 of the Family Court Act. Five days later, appellants petitioned to adopt and retain custody of the child and also moved to dispense with the necessity of respondent's formal consent, alleging abandonment and, in effect, constructive consent. These matters were consolidated for trial, which commenced on July 2, 1981 and continued intermittently until February 16, 1982. Although the court rendered its decision on March 31, 1982 and awarded custody to Landaverde, a further hearing was conducted on May 18, 1982. The court subsequently handed down a second opinion, dated May 28, 1982, adhering to its previous ruling, and, on August 20, 1982, the court *sua sponte* issued a supplemental opinion (115 Misc 2d 248).

As elicited at trial, the facts are as follows:

Susan and James Howie, a childless couple in their thirties, were married in July of 1977 and reside in New York City. He is a self-employed architect; she is an editor of college textbooks who works at home. In January of 1980, after having unsuccessfully endeavored to adopt a child through an agency, Susan Howie wrote to a California woman, Sheila Thill, whom she had known some 12 years earlier. Thill had herself adopted a child, and the

Howies hoped to obtain general information from her concerning adoption. Thill telephoned Susan Howie in February, advising her that Christina Landaverde, a live-in domestic at a neighbor's house in San Francisco, was pregnant and interested in relinquishing her baby for adoption. Susan Howie then wrote to Landaverde's employer, Mr. Filipelli, describing herself and her husband and advising him of their longing to adopt a child. Thill, who is fluent in Spanish, translated the letter for Landaverde, whose knowledge of the English language was, and apparently remains, rudimentary. She explained to respondent the various options regarding the placement of her child, testifying that their conversation lasted for about 45 minutes. According to Thill, they "discussed the fact that she was Catholic and didn't consider an abortion. She wanted the baby to go to a good family." In addition, between them the Howies have eight siblings, and Landaverde "liked the idea that there were a lot of children and aunts and cousins in the Howie family".

James Howie thereupon got in touch with his New York counsel, Michael Mossberg, and preparations were commenced under the Interstate Compact on the Placement of Children (Social Services Law, § 374-a) to bring respondent's baby to New York for the purpose of adoption. The Howies also retained a California lawyer, Kieran Manjarrez, who shared office space with Landaverde's employer, also an attorney. When Manjarrez spoke with respondent in Spanish in February of 1980, Landaverde indicated that she wished to have her child adopted by the Howies. He also mentioned other alternatives to her, but she rejected them, declaring that "it wasn't the question of just financially supporting the child * * * it's also a question of me having support, emotional support, for raising a child in the context of a family and it is also a question of what the child's needs [sic] in terms of being brought up in a family environment." In April of 1980, Manjarrez met with Landaverde at his office and informed her that he was representing the Howies. He described adoption procedures to her, notifying her that she would be required to sign certain papers under the Interstate Compact but that these documents did not finalize the adoption. After respondent

expressed some confusion, Manjarrez arranged for another attorney, Richard Bryant, to represent her on a *pro bono* basis. Bryant outlined the adoption process to her, stating that she would not be forfeiting her right to the child simply by signing the documents. On April 30, 1980, Landaverde executed the "Declaration * * * Re Interstate Placement of Child", which affirmed, in part, that "It is my wish and I hereby consent that my child or children be placed for adoption with the aforementioned Mr. and Mrs. James Howie."

Manjarrez also brought Landaverde into contact with Janet Culbertson, a social worker at San Francisco General Hospital. Culbertson, who has a graduate degree in social welfare and is fluent in Spanish, met with respondent on May 12 and May 16. She delineated the varying social services available to single parents, as well as the different types of adoption. She also told respondent that she could receive counseling if she was so inclined. Culbertson asserted at trial, however, that Landaverde "seemed very set" on proceeding with the private adoption. "She felt satisfied with the arrangements being made through the private attorneys." Sometime in the spring of 1980, at a "baby shower" tossed by the sister of Jose Napoleon Dubon, the child's father, Manjarrez again had a conversation with Landaverde. She asked him if relinquishing her child meant that she had a "black heart", and he suggested that she consult a priest. She subsequently called Manjarrez to inform him that she had spoken to a priest and was feeling better about the whole thing.

On June 18, 1980, at the behest of Manjarrez, Jose Dubon executed a document containing his consent to the proposed adoption. Manjarrez and respondent held further discussions in June or early July of 1980, at which time Manjarrez advised her that the Howies planned to take the baby back to New York and initiate adoption proceedings there but that nothing would be final until "she signed the paper" before a California Judge and approval was given by a New York court. He also recommended that she be certain of her desire to go through with the adoption since any later reversal would be unfair to the Howies. She replied that she understood. In that respect, Sheila Thill

testified that between May and July of 1980, Landaverde continued to express her determination to have the Howies adopt her baby. To Culbertson, who visited with Landaverde on a number of occasions prior to the birth, she also remained unswerving in her resolve.

Respondent entered the hospital on July 16, 1980, requesting that Thill be present. Immediately following the delivery, she directed that Thill telephone the Howies and announce the birth. That afternoon, the Howies flew to California, went to the hospital and administered a bottle to the baby. On July 17, Landaverde had three meetings with Culbertson regarding the prospective placement. After Culbertson had provided her with some explanations, respondent signed the hospital release and a placement for adoption form. According to Culbertson, "I had her read through them and then she signed the forms, both in English and in Spanish." Landaverde was still firm in her intention to proceed with the private adoption, and, Culbertson stated, she believed that adoption was in the best interest of both herself and the child. Consequently, when the Howies returned to New York, they were accompanied by the new baby.

Landaverde testified at trial that no pressure had been exerted upon her to part with the infant. However, some two weeks after the birth, she began to experience misgivings concerning the wisdom of her action. She communicated her uncertainty to Manjarrez who suggested that she consult with Bryant, as well as her priest. Ultimately, she was referred to another attorney, Ramiro Castro, who eventually replaced Bryant as her counsel. Although Manjarrez had, in the meantime, undertaken steps to arrange for a court date in California in order to obtain respondent's formal approval of the adoption, in October of 1980 he received notification from Castro that Landaverde wanted her baby back. By letter dated October 16, Castro declared that his client had decided to withhold consent to the adoption of her son and that he had advised her to file a habeas corpus petition. A copy of this letter was forwarded to the New York attorney who had been retained by the Howies to assist them in acquiring custody of the child, and, in November of 1980, Manjarrez withdrew from the

case. The habeas corpus proceeding initiated in California was not successful, so respondent came to New York and commenced the instant petition.

At the trial, the Howies called a number of witnesses on their behalf. Dr. Herbert Porter, a pediatrician at the New York Foundling Hospital, first examined the infant in August of 1980. Roberta Taffer, a certified social worker, was the Children's Aid Society employee who conducted a home study of the Howies in May of 1980, and highly recommended them as adoptive parents. A board-certified psychiatrist, Dr. Stanley Turezki, who has practiced, written and lectured for 11 years in New York, met the Howies in November of 1981 as the result of a referral by their pediatrician, Dr. Porter. Victor Remer, executive vice-president of the Children's Aid Society, claimed to have both a business and social relationship with the Howies. Albert Niedan, a Chase Manhattan Bank officer, is a professional and personal associate of the Howies, and Rita Kaehler, a practicing psychotherapist, is a neighbor of theirs. Reverend Michael Donohue, a Catholic priest at the Church of St. Francis Xavier in Manhattan, knows the Howies as parishioners, has visited their home on several occasions and baptized the baby.

As depicted by these persons, the Howies have provided the child with a harmonious and loving environment in which he has thrived. He is uniformly characterized as being a lovely, healthy little boy, who is happy, well cared for and developing at an optimal level. Drs. Porter and Turezki both asserted that when a young child who has established a parental bonding or attachment is removed from that stable background, he becomes vulnerable to emotional, psychological and intellectual regressions and is likely to suffer permanent damage. With respect to the possible effect on the child of a transfer from the Howies to his natural mother, Dr. Turezki asserted: "Nothing good can happen from it and a lot of bad things can happen from it." While it was theoretically conceivable that the results could be "neutral", the probability was that the move would be harmful. At any rate, it was "certain that there would be negative short term consequences."

Christina Landaverde, 31 years of age, testified through an official Spanish interpreter. After questions relating to the respondent's status in the United States were objected to by her counsel on Fifth Amendment grounds, the parties stipulated that she is an illegal alien who has never filed a tax return. Until 1979, when Landaverde arrived in this country via Mexico, she lived in El Salvador. For the six years prior to her departure, she had been employed at a school and had cared for the children there. In the United States, she has worked as a live-in domestic, first for the Filipellis and now for a family in New York City. During the time that she was with the Filipellis, she met Jose Dubon and, shortly thereafter, discovered that she was pregnant. Dubon proposed that respondent undergo an abortion, but she rejected this option for religious reasons. Her version of the events leading to the Howies' attempt to adopt her son and her subsequent change of mind did not differ significantly from that recounted by the Howies.

There was an inquiry into the subject of Landaverde's future plans for the child should he be restored to her custody. In January of 1982, she proposed taking him back to El Salvador. She maintained that in September or October of 1981, she telephoned her mother to inform her of the birth. Her mother then wrote her a letter (which the respondent, despite being directed to do so, failed to produce in court), instructing her to come home with the baby. It was her intention, she stated, to reside in the capital city of San Salvador with her 52-year-old mother and two working sisters in their thirties. At this point, Landaverde's testimony became rather confusing. There was mention of her mother living in two separate houses, one in San Salvador and one in a town some distance from that city. It was unclear whether one or two sisters would make their home with them, and there seemed to be some doubt over her mother's age (since respondent, who has seven siblings, gave her eldest brother's age as 41) and the state of her mother's health. Moreover, there had been no further contact between Landaverde and her family since her mother's purported letter. She also admitted that the various factions engaged in the civil war had been involved in encounters in the vicinity of her mother's residence.

In the course of being questioned about the claim that her family had indicated a willingness to assist her in raising her son, Landaverde offered an alternative plan. She announced that she had spoken with Jose Dubon's sister, Alba Cruz, and Cruz had invited her to come back to California. However, she still insisted that her first choice remained returning to El Salvador. By the time of her next court appearance on February 2, 1982, respondent had definitely decided to take the child to California "because in Salvador it is bad and I want to have protection" for the baby. First she contended that she would stay in Cruz' home in San Francisco, whose precise address she did not know, but whom she understood resided with her two teen-aged sons and her husband (not their father). Then Landaverde asserted that she did not expect to move in with Cruz but would, instead, marry Dubon, also an illegal alien, and live with him in Mill Valley. According to respondent, she had conversed with him over the telephone some days earlier, and they had resolved to marry. Although she was not familiar with his situation over the past year and one half, she was aware that he worked as a janitor and lived alone.

Jose Dubon, who also took the stand, confirmed Landaverde's statement that they intended to marry as soon as possible and to do so regardless of the outcome of the court proceedings. In fact, he had been considering marriage since September of 1980 but had not raised the subject with respondent until recently only because he had been unable to locate her. Dubon conceded that while he had talked with Landaverde over the telephone, he had not seen her since his arrival in New York. He also testified that he was living with an older brother in San Francisco, was not currently involved in a relationship with another woman and had not fathered any other children.

On March 31, 1982, the Family Court issued the first of three opinions in this case. The court concluded that although it was "fearful that the child's welfare will be endangered by his removal from the couple who seek to adopt him," it was, in accordance with prevailing precedents, compelled to deny the Howies' petition for adoption and to grant the mother's request for custody. In the view

of the court, a "child has a constitutional right to consideration of his welfare when the state exercises its power with regard to his custody. *Bennett v. Jeffreys,* 40 NY2d 543, 546. Nevertheless, parental custody is deemed of pre-eminent value unless the parent is unfit, and preservation of that standard is deemed fundamental to our social system. See *Dickson v. Lascaris,* 53 NY2d 204, 208-210; *Bennett,* 40 NY2d at 549. Since there is no unfitness on petitioner's part, her custody is granted."

Approximately five weeks after he had appeared in court declaring his intention to marry Landaverde, Dubon married a woman with whom he had been living for some years and with whom he had two children. The marriage may have been prompted by an effort on Dubon's part to resolve his immigration problems. A further hearing was held on May 18, 1982. It was now Landaverde's position that she would return to California and reside with Dubon's sister, Alba Cruz, who would help her in caring for the baby. While respondent was at her job, the child would be looked after by Cruz, and vice versa. Both women would be employed as domestics, and each of them would work half a day. Once again there was conflicting testimony about houses. In contrast to her previous contention that Cruz lived with her two sons and husband, Landaverde now claimed that Cruz had two homes. In one of these she supposedly resided alone during the week and she shared the second with her sons on weekends. During the week, the boys were without parental supervision.

The court handed down its second opinion on May 28, 1982, adhering to its original determination, but nonetheless expressing its belief that:

"There is cause to distrust any testimony by petitioner as to a plan for the child, considering that she testified until close to the end of the main trial that she would take the child to El Salvador, where her relatives would help her (see opinion of March 31, 1982); that she then shifted to the California marriage plan; and she has again shifted to the plan of joint care with the father's sister (all within a 3-month period).

"The conclusion is inescapable; To grant custody to peti-

tioner means that the child will go from a stable, secure, devoted two-parent home, in which loving attention to his development has been a priority from birth (see main opinion), to unsettled, precarious, shifting, unpredictable care * * *

"The expert psychiatric testimony, which was highly persuasive (see opinion of March 31, 1982), showed that separation from respondents would cause the child a serious psychological trauma for either a short or long term; whether the trauma would be alleviated or would be lasting, would obviously depend on whether he would be transferred from respondents into a stable and propitious environment. The hazards for the child in petitioner's alleged present plan indicate the likelihood that the trauma will be a long term * * *

"Accordingly, there are such grave reasons to conclude that the child would be harmed by transfer of custody to the mother, that it is difficult if not impossible in the instant case, to reconcile the interests of the mother and the child on the basis of the rule that 'both interests . . . ordinarily converge.' *Dickson v. Lascaris,* 53 NY2d 204, 208."

Indeed, the Family Court was apparently so disturbed by what it perceived as a threat to the child's welfare created by the prospective transfer of custody from the Howie's to respondent that on August 20, 1982, it *sua sponte* issued a third opinion (115 Misc 2d 248). The court emphasized its concern that while Landaverde "has for some years taken care of children as a domestic worker, and she is well regarded in that portion," the evidence establishes that she has "no stable plan for the child." It reiterated (p 252) its conviction that: "Despite sympathy for the petitioner's desire for the child's custody and for her economic handicaps, the conclusion is inescapable: To grant custody to petitioner means that the child will go from a stable, devoted two-parent home, to unsettled, precarious care, and to a very real possibility of involuntary but actionable parental neglect as well as a childhood in the foster homes of strangers."

However, despite the court's profound disquiet with its own ruling, it interpreted *Matter of Dickson v Lascaris* (53

NY2d 204, *supra*) to mandate a showing of "grievous cause or necessity," as well as the sort of "misconduct" referred to therein, before a biological parent could be deprived of custody. Since the court did not deem these factors to be present here, it considered itself constrained to award custody to the natural mother, Landaverde. I disagree.

At the outset, it should be noted that where an unsupervised private placement is involved, no statute is applicable, and the pertinent guidelines derive from principles of common law. (*Matter of Bennett v Jeffreys,* 40 NY2d 543.) In that connection, the Court of Appeals, in *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.* (28 NY2d 185) summarized the status of the law with respect to the relationship of a natural parent to a child. According to the court (p 192): "It has repeatedly been determined, insofar as the best interests of the child are concerned, that '[t]he mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood' * * * It has been well said that 'the status of a natural parent' is so important 'that in determining the best interests of the child, it may counterbalance, even outweigh, superior material and cultural advantages which may be afforded by adoptive parents' ".

The court in *Scarpetta* explained that except where a nonparent has been accorded legal and permanent custody of a child through adoption, guardianship or otherwise, an individual wishing to " 'take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child's welfare compels awarding its custody to the nonparent.' " (*People ex rel. Scarpetta v Spence-Chapin Adoption Serv., supra,* at p 193.) In ascertaining fitness, a parent "who is 'a drunkard, an incompetent, a notoriously immoral person, cruel or unkind towards [her] child' (*Matter of Gustow,* 220 N.Y. 373, 377), or whose conduct evinces indifference or irresponsibility (*Matter of Cleaves,* 6 A D 2d 138) would not be a proper person to assume" custody over the child (*supra,* at p 194). Although the motivation of a parent who is seeking return of a child is a significant factor in deciding

fitness, the mere change of mind by a natural mother does not render her unfit. Quite the contrary, it is to be regarded with great sympathy. However, in no event, "may a contest between a parent and nonparent resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child" (*supra,* at p 194).

Yet, in *Scarpetta* (*supra*), which concerned the efforts of a natural mother to retrieve her child from the agency to which she had surrendered her four-day-old infant (who was shortly thereafter placed with a family for adoption), the mother, a native Colombian, was well educated, financially secure and generally in an appropriate position to take care of her baby. The matter before us presents such a dilemma precisely because the mother, Landaverde, is not, as the record clearly reveals, so fortuitously situated. She is an illegal alien. Whether she will be able to remain in this country, and what effect the birth of her son may have on her status here, are uncertain. Whether the latter has any influence on her motivation is also unknown. However, as a result of respondent's equivocal immigration status, she is not eligible for many of the government benefits, including food stamps and public assistance, ordinarily available to other persons or families confronted with financial hardships. Moreover, she works as a live-in domestic and has no relatives in the United States who would be able to provide support or to tend her son while she is at work.

Landaverde's circumstances are, therefore, not even comparable to that of other poor unwed mothers since the latter generally have certain community and personal resources at their disposal. It was her recognition of just this fact — that she lacked the emotional sustenance or family environment necessary for the proper maintenance of a child — that induced her to relinquish her son in the first place. Landaverde's poverty is, in that regard, relevant only when coupled with all the other inadequacies apparent in her situation. It is evident that the Family Court was so greatly troubled by its action in returning the child to respondent precisely because of the existence of as many negative factors as are here apparent and their

likely cumulative and deleterious impact upon the boy's future development.

Significantly, Landaverde has demonstrated great confusion over her plans for the child. In the course of her testimony, she set forth three different options — (1) bringing the boy to El Salvador and living with her mother and sister(s), (2) marrying Jose Dubon, the father of her child, and (3) moving in with Dubon's sister in San Francisco. The first of these alternatives seems to have been abandoned, the second is no longer feasible due to Dubon's marriage to another woman, and the third was obviously ill conceived and badly formulated. Assuming that Alva Cruz, Dubon's sister, is actually willing to undertake some responsibility toward Landaverde and her son — and there is no proof of this other than respondent's unsupported assertion to that effect — she hardly appears to be in a position to offer much assistance. Cruz, who is employed as a domestic herself, is the mother of two sons. There is some indication in the record that she is unable to provide her own children with sufficient supervision, much less help care for respondent's child. Additionally, Landaverde's account manifested remarkable uncertainty and contradiction as to Cruz' family situation. It is not even clear whether she is, or is not, separated from her husband and where, or with whom, she resides. Yet, notwithstanding Landaverde's lack of information as to Cruz' circumstances, the plan which she proposed to the court would entail Cruz being amenable to adjusting her work schedule (and, incidentally, apparently foregoing a part of her pay) as an accommodation to respondent. At best, it is highly speculative whether she would be agreeable to changing drastically her routine on Landaverde's behalf. The Family Court understandably found that there was reason to distrust respondent's testimony insofar as it related to her plans for her son.

The conclusion is, in fact, unavoidable that Landaverde, who may be a sincere and loving woman, has no real notion of what she will do with the boy, or how she will care for him. The Family Court was correct in characterizing a transfer of custody in this case as meaning that the child would be sent from a stable, loving two-parent home in

which he has flourished into a precarious, unsettled existence. Not only would he be separated from the only family that he has ever known, an extremely traumatic experience for any young child, but he would be facing a situation which would exacerbate the harmful effects created by such an abrupt uprooting of his life. Unless this court were to hold that absent obvious signs of unfitness on the part of the biological parent (for example, alcoholism, extreme mental disturbance, immorality or a history of being physically or psychologically abusive), that parent will always have a pre-eminent right to custody regardless of the interests of the child, there can be no valid basis for returning respondent's son to her care. The evidence is overwhelming that a shift in custody here would almost certainly be severely damaging, and possibly catastrophic, to the boy.

In *Matter of Bennett v Jeffreys* (*supra,* p 546) the Court of Appeals declared that: "The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interests of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude".

In *Bennett,* petitioner a 15-year-old unwed girl gave birth to a daughter. Under pressure from her mother, she reluctantly acquiesced in the transfer of the infant to an older woman, Mrs. Jeffreys, a former classmate of the child's grandmother. Although the quality and quantity of the petitioner's later contacts with her daughter were disputed, the Family Court found that there was no statutory surrender or abandonment. Mrs. Jeffreys did intend to adopt the child, but she never took any formal steps to do

so. Eight years later, the natural mother, now 23, about to graduate from college and living with her parents in a private home having quarters available for herself and the child, sought to regain the custody of her daughter. Moreover, in the interim, the attitude of her parents had altered, and they were now anxious that she keep the child. Mrs. Jeffreys, on the other hand, was by now separated from her husband, employed as a domestic and, on occasion, housed the girl in a motel. Yet, the Court of Appeals reversed the order of the Second Department (51 AD2d 544), which had awarded custody to the natural mother, and remanded the matter for a new hearing to explore more fully the issue of the child's best interests.

The Court of Appeals reiterated the established doctrine that: "The parent has a 'right' to rear its child, and the child has a 'right' to be reared by its parent." (*Matter of Bennett v Jeffreys, supra,* at p 546.) However, the court (p 546) proceeded to state that "there are exceptions created by extraordinary circumstances, illustratively, surrender, abandonment, persisting neglect, unfitness, and unfortunate or involuntary disruption of custody over an extended period of time." Thus, while the State may not ordinarily deprive a biological parent of the custody of his or her child except in an "extraordinary circumstance which would drastically affect the welfare of the child" (at p 549), where one of these exceptional factors is found to be present, that will trigger an inquiry into the child's best interests. In the *Bennett* case, the court considered the prolonged separation between the biological mother and her daughter to constitute such an extraordinary circumstance.

The instant situation poses an even more compelling reason for not deferring automatically to the natural parent. When Bennett petitioned for custody, she had made significant progress in putting her life in order, whereas the situation of the child's guardian had deteriorated to such an extent that she no longer even had an established home. Yet, ultimately the Family Court awarded custody to Jeffreys (now Marrow), and the Appellate Division affirmed on appeal. (*Matter of Bennett v Marrow,* 59 AD2d 492.) This determination was based on a finding that the emotional needs of the child (who had, in the meantime,

been restored to her biological mother but who remained unswerving in her desire to return to Jeffreys-Marrow) were not being adequately satisfied by Bennett. In the present case, the child has spent the entire period of his life — nearly three years — with the Howies. They are the only parents that he has ever known, and, under their loving care, he has developed beautifully. In fact, it is questionable whether the boy and his natural mother even share a common language. To send him to Landaverde and to an unstable future might serve respondent's needs. The child, however, will certainly be harmed.

Further, despite the Family Court's reliance upon *Matter of Dickson v Lascaris (supra)* nothing therein mandates the result reached by the trial court. In *Dickson,* in the summer of 1974, the biological father entrusted his three children to a family friend after his wife had refused to share responsibility for them or the household and a series of temporary arrangements had proved unsuccessful. He regularly visited the children in the fall of 1974 and made four payments of support. However, support payments were then discontinued, and during 1975, the father had only one or two contacts with his children. In 1976, he reestablished contact with them. The next year, he began his efforts to regain custody, and, following his divorce and remarriage, he instituted a formal proceeding. The Family Court denied his petition finding that the father had "passively" abandoned the children, and that their best interests required that they remain with their current custodian. On appeal, the Appellate Division declined to adopt the "passive" abandonment concept but perceived extraordinary circumstances in the length of custodial interruption. Although the Court of Appeals reversed, it specifically reaffirmed its prior holding in *Matter of Bennett v Jeffreys (supra).* However, the court disagreed with the conclusion that the father's interruption of custody constituted an extraordinary circumstance. According to the court (pp 209-210): "where a period of separation is attributable to the parent's efforts to regain custody lawfully, that separation is entitled to little, if any, consideration * * * Since a large portion of the separation here occurred during the father's informal and formal attempts to obtain

custody, the custodial disruption does not rise to the level of an extraordinary circumstance. Quite bluntly, a child is not a piece of property over whom title may be acquired by adverse possession."

The Family Court apparently misconstrued *Dickson* (*supra*) as representing a departure from the previous decision of the Court of Appeals in *Matter of Bennett v Jeffreys* (*supra*). In actuality, the court in *Dickson* relied on *Bennett* and simply determined that the standard enunciated in *Bennett* had not been met in the case with which it was then confronted. The children in *Dickson* had resided with their father prior to their relocation to the family friend, and they knew him. Nowhere in the record was there any evidence that the father had ever intended anything other than an interim placement while he endeavored to surmount his present difficulties. There was also nothing to show that removal of the children from their custodian exposed them to the risk of any psychological or emotional damage. In distinct contrast, the child who is the subject of the instant custody dispute does face a substantial possibility of harm if he is transferred from the custody of the Howies to that of his biological mother. Under the facts of the case before us, extraordinary circumstances exist which require a consideration of the child's best interests. In that connection, the record herein contains sufficient information to determine that the boy's interests clearly would be best served if he continues to reside with the Howies.

Appellants contend that the Family Court erred in rejecting their argument that Landaverde's execution of certain documents, along with her statements of intent to have her son adopted, amount to a consent to adoption adequate to comply with the statutory requirements. (Domestic Relations Law, § 111.) However, I am not persuaded that respondent ever consented to his adoption and, accordingly, the Family Court properly denied the Howies' petition for adoption.

Orders of the Family Court (NANETTE DEMBITZ, J.), entered on March 31, 1982, May 28, 1982 and August 20, 1982, which granted the petition of Christina Landaverde for custody of her son and denied the petition of James and

Susan Howie for custody or adoption, should be modified on the law, without costs or disbursements, to the extent of denying the petition of Christina Landaverde for custody and granting the petition of James and Susan Howie for custody, and otherwise affirmed.

KASSAL, J. (dissenting). I fully concur with the views expressed in the dissenting opinion of Justice MILONAS and present some additional observations.

On this record, the present situation, which vitally affects the welfare of the child, measures up to the "extraordinary circumstance" standard posed by the Court of Appeals in *Matter of Bennett v Jeffreys* (40 NY2d 543). It is critical that the best interests and welfare of the child be considered as of the present date. On one hand, we must take into account that we have a three-year-old boy who has been with his devoted foster parents for the full period of his life. Against this, we must weigh the probable alternatives in the child's future, especially that the natural mother may be involuntarily returned to El Salvador, whether because of deportation by the immigration authorities, since she is an illegal alien or because of her economic condition. Also, there is a strong possibility that she may voluntarily return to that country. On balance, with special consideration, to the mother's interests and all the factors, I believe the determination to have the child returned to the natural mother is not proper. (I am also mindful of the fact that, as recently as last week, the United States State Department issued a bulletin in which it considered El Salvador as being an unsafe country.)

The majority incorrectly implies that one of the principal factors upon which we, the dissent, would decide this appeal is the natural mother's lack of finances, particularly in contrast to the financial position of appellants. The future of the child must be determined by an appropriate balancing of all competing considerations, and the respective financial standing of the parties is not the standard which we employ nor do we advocate such a measuring rod. Obviously, all factors must be carefully weighed.

As to the intimation that the mother did not have independent or competent counsel to advise her, this is not

supported by the record. Although the attorney who first represented her was provided and was paid for by the Howies, that attorney did, without dispute, present the various alternatives to her in English as well as in Spanish and, thereafter, he made arrangements to have another attorney represent her on a *pro bono* basis. He also arranged to have her consult with a social worker who again conversed with her in Spanish and met with her on two occasions, outlining all of the various alternatives. The record also discloses that there were three lengthy hearings in the Family Court in which the mother was well represented by competent counsel, and the Family Court Judge, on all three occasions, did find for the natural mother after what was obviously a great deal of soul searching and concern. All of this belies the suggestion that she suffered because she did not have adequate counsel or independent advice.

I believe the majority is unduly concerned with the thought that the boy's legal status may be "ambiguous for the rest of his life" if he remains with the Howies, since they will only have custody but cannot legally adopt the child. Concededly, it would be preferable to have a formal adoption. However, it should be kept in mind that the custodial parents do enjoy almost every right and do assume all the responsibilities of parenthood, except for the legal status of adoption. This does not pose so significant a concern affecting the child's welfare as to preclude us from an over-all meritorious determination, with due consideration of all factors, including the best interests and welfare of the child. On balance here, the legal relationship of the child to the custodial parents is far less significant than the prevailing consideration that there is actual, loving parental care which the boy now has and, presumably, will continue to have.

I must also take issue with the last point presented in the opinion of the majority, namely that we are accomplishing by legal fiat what Solomon did not do. In truth, each and every day, on a regular basis, Judges are called upon to make extremely difficult and sensitive decisions with regard to the custody of children, whether it be in matrimonial actions or in custody proceedings, with the

determination being which of two people would be the better custodian for the child. This responsibility has been thrust upon us not by choice but by reason of our judicial office and the needs of society. It is, indeed, an awesome one. But we are daily called upon in several other areas to exercise great wisdom, not the least of which is the determination of credibility, which is divining the truth and, similarly, we are mandated to be Solomon-like every time we mete out criminal sentences. As a matter of fact, in the discharge of our duty, we are even called upon to make the ultimate determination of life or death in a capital punishment case. This entrusts us with the supreme responsibility.

Thus, we are confronted with the necessity of making a determination as to this child in these circumstances at this point in time, not as to the time of birth. Although I recognize the improbability of legal adoption by the Howies, I have concluded that that factor is far from critical and does not outweigh the overwhelming advantages of the child remaining with the persons who have been his only "real" parents for the last three years, since the date of his birth.

MURPHY, P. J., and Ross, J., concur with ASCH, J.; MILONAS and KASSAL, JJ., dissent in separate opinions.

Orders of the Family Court of the State of New York, New York County, entered on March 31, 1982, May 28, 1982 and August 20, 1982, respectively, affirmed, without costs and without disbursements.